KATHERINE F. WALCK, PETITIONER-RESPONDENT, v. JOHNS-MANVILLE PRODUCTS CORP., RESPONDENT-APPELLANT.

Argued May 18, 1970—Decided July 20, 1970.

Mr. *Seymour B. Jacobs* argued the cause for petitioner-respondent (*Messrs. Balk, Jacobs, Goldberger & Mandell,* attorneys).

Mr. *Richard H. Thiele, Jr.* argued the cause for respondent-appellant (*Messrs. Wharton, Stewart & Davis,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. This is a heart death workmen's compensation case. The Division of Compensation made an award in favor of petitioner Katherine F. Walck, widow of decedent. The County Court and Appellate Division (in unreported opinions) affirmed and we granted respondent's application for certification. *Walck v. Johns-Manville Products Corp.,* 55 *N. J.* 358 (1970).

An original and an amended petition for compensation were filed. The first, which was filed on December 11, 1963, simply alleged that on March 14, 1962 at 9:00 A.M. "[D]ecedent suffered a heart attack at his office desk and was taken to [the] plant dispensary [from which] he was taken to Somerset Hospital where [he] expired at approximately 10:20 A.M." The amended petition, which was filed three months later, alleged that "during the course of his employment, [decedent] was subjected to various stresses and strains and conditions, arising out of and in the course of his employment, which caused and aggravated a cardiovascular condition which culminated in a fatal heart attack on March 14th, 1962."

At the hearing in the Division, petitioner sought to establish the employer's liability on two theories. The first thesis was that the deceased employee, Claude W. Walck,

had been subjected to certain employment-connected emotional tension which so acted upon an underlying condition of heart disease as to cause or contribute to his fatal heart attack on March 14, 1962. The second theory was that on many occasions during the course of Walck's employment he was treated and examined at the plant dispensary "for certain complaints" and that there was a "failure to properly evaluate and diagnose the decedent's health status and by reason of that failure * * * the decedent suffered injury which contributed to his death." By way of explanation of the precise nature of this charge, petitioner's attorney advised the Judge of Compensation that he had used the term "failure * * * advisedly * * * in a legal sense," and that he had no intention of imputing "any carelessness or any negligence." He was simply alleging a non-negligent mistaken diagnosis.

The trial judge found that a right to recover had been established on both theories. The county court judge affirmed on the ground that the evidence showed employment-induced emotional strain which caused or contributed to Walck's heart attack and death. Having sustained the award on that basis, he declared it unnecessary "to pass upon the applicability of the humane instincts doctrine," which was enunciated by our Court in *Dudley v. Victor Lynn Lines, Inc.*, 32 *N. J.* 479 (1960) and on which petitioner relied. The Appellate Division affirmed on the same basis.

Walck became employed in respondent's industrial relations department on June 16, 1951. He was 41 years of age at the time and 51 years old when he died. In the 10 years and nine months of service, his wages had increased from $5,000 to $10,150 annually. In 1962, he was Supervisor of Employment and Employee Relations; it was a desk job. Like all other employees, he was given a pre-employment medical examination. That examination, including a fluoroscopic study of his chest, was negative. His only complaint was that he suffered from occasional indigestion. This examination was repeated annually thereafter.

The only fact witness produced in support of petitioner's case was decedent's widow, Katherine F. Walck. She testified that, as far as she knew, during the two or three years before his death her husband had been in good health except for nerves and tension. She was not aware of any heart condition, but said that her husband had been treated by the family doctor for the nerves and tension. She testified that over a year before the fatal heart attack Miller Naylor, respondent's manager of industrial relations, retired. He had been Walck's superior from the inception of her husband's employment. On his retirement, one Grote was appointed to succeed him. After this event, Mrs. Walck said her husband seemed nervous and tense. This condition showed itself in the evening after he came home, when he "would seem aggravated, a bit irritable." He would want to relax, watch television or read the newspaper. Sometimes he would fall asleep before dinner which he had not done in earlier years. He told her he was concerned that he might lose his job. When Naylor was his superior he had never "evidenced these feelings of nervousness and tension." However, no testimony was offered to show that Walck and Grote ever had words, or a dispute or any kind of a disagreement, or that Grote had ever criticized Walck's work, or reported him for anything, or ever had him "on the carpet." No employee was produced to say that Grote and Walck did not get along together. In the voluminous records of respondent's clinic, which describe Walck's many visits and the many kinds of complaints which brought him there over the years (of which more later), not one complaint related to an employment condition or a problem with a superior — Grote or anyone else. In fact, it does appear that, during the period after Grote became manager of the department, Walck received a $600 wage increase.

According to Mrs. Walck, her husband did not tell her why he was concerned about his job. She put it this way: "I suppose on certain days an insecurity feeling, not knowing how he stood, that type of thing." She described a single

incident which he mentioned to her. About six months or a year before his death, one day when Walck was working at his desk Grote suddenly appeared "and stood at the desk and when [Walck] looked up and spoke to him he sort of eased his way out. He [Walck] couldn't figure out why he had come in there." There was nothing further to that episode and no explanation as to why Grote's presence in the office near Walck's desk was of any significance — beyond the routine appearance of a superior.

It may be well to note at this point that the trial court criticized respondent for failing to produce Grote as a witness. In our view, the criticism was unwarranted; we see nothing of significant consequence in this isolated, momentary episode, or in the remainder of Mrs. Walck's testimony, to rebut or to explain.

At any rate, Mrs. Walck asserted that, in addition to her husband's nervousness and tension during the year or so before the fatal heart attack, he began to complain of pains and pressure in the chest area and pains in his right arm. He consulted their family physician, Dr. Robert C. Wilson of Somerville, a specialist in internal medicine, for the nerves and tension. The doctor is a Diplomate of the American Board of Internal Medicine, Fellow of the American College of Physicians and Director of Medicine at the Somerset Hospital. Fifty percent of his practice involved the treatment of patients with cardiovascular complaints or heart conditions. He had known Walck quite well socially over a 12-year period and had examined and treated him for over six years before the fatal heart attack. It is appropriate to note here that the doctor could not recall any occasion over the six-year period when Walck made a complaint referable to his employment, to his fellow employees or to any superior. Dr. Wilson's office records showing all visits, complaints and treatments during the six years were marked in evidence. They also revealed no such complaint.

In addition to his employment with respondent, Walck had long been active politically in Somerville. He had been

reelected as councilman on at least one occasion and had served in that capacity for six years. In November 1961, he was elected Mayor and took office on January 1, 1962. According to Mrs. Walck, he enjoyed political life and, as far as she could tell, it caused no nervousness or tension. She conceded that his official activity took him out of the house two or three evenings a week, occasionally as late as midnight. She did not mean to infer that he encountered no difficulties in his political tasks; she was sure that from time to time the council ran into "very sticky problems."

It appeared also on cross-examination that Walck had suffered from backache for a long time and, although non-work connected, was given physiotherapy for it at the plant clinic. Mrs. Walck admitted also that her husband had aches and pains that reoccurred on several occasions throughout his employment from 1951 on, that he was in the Somerset Hospital in 1953 for three days for gastric complaints, and that he had a stomach G. I. series around 1958. In 1957 he was treated by a dermatologist for a skin cancer in his left ear which cleared up after a few months of treatment.

On March 14, 1962, when Walck left home for work at about 7:40 A.M. he was not complaining of anything. Around 10:30 A.M., Dr. Wilson advised Mrs. Walck by telephone from the Somerset Hospital that her husband had passed away.

The records of the employer show that at 8:45 A.M. Walck walked into the clinic from his office which was "right next door." He complained of severe pain in his chest, shortness of breath and a burning sensation in the throat. He was put to bed there. Dr. DuBow, the plant physician, noted that the pain was said to be arising from the tip of the sternum and traveling up to the neck. The pulse rate was 72 and the blood pressure 130/80. Walck was reassurred and given triple bromides, feorinal and sedation. The pain persisted and began to radiate to his back. At 9:20 A.M. he was given 50 milligrams of demerol. At this time the blood pressure was 110/70 and the pulse rate 86. The pain persisted and began to radiate to his left hand. Dr. DuBow's overall impression

then was that an acute coronary thrombosis had developed. Walck was given morphine sulphate at 9:40 A.M. and Dr. Wilson, the family physician, was called. He advised immediate hospitalization. Oxygen was administered and Walck was taken to the emergency room of the Somerset Hospital. He arrived there at 10:06 A.M. and Dr. Wilson was present. Death occurred at about 10:20 A.M.

An autopsy was performed and completed within two hours after death. The cause of death was found to be "Acute Cardiac Dilatation from Myocardial Infarction." With respect to the heart condition, the autopsy revealed "arteriosclerotic cardiovascular disease with coronary arteriosclerosis, with stenosis, left anterior descending coronary artery, with acute anterior myocardial infarction, acute cardiac dilatation, pulmonary edema and congestion and cyanosis." The description of the findings is as follows:

"The heart is very slightly enlarged but markedly dilated. The pericardium is thin and the sac is dry. The epicardium is unremarkable. The myocardium is dull reddish-brown, moderately firm and somewhat flabby. The anterior apical half of the left ventricle shows a subepicardial sharply demarcated zone which is slightly moist, slightly soft and has a tannish-brown color. A fairly sharp line of demarcation separates this from the reddish-brown surrounding musculature. The cut surface of this area shows some swelling and slight obliteration of the normal muscular gross striations. The endocardial aspects are smooth, thin and glistening. The valve cusps and leaflets are thin and delicate and have a normal configuration. The coronary arteries arise and course normally. The left coronary artery shows moderate thickening by yellow firm focally calcified material. This process is most marked in the left anterior descending branch approximately one-third of the way down the course. Here there is almost complete occlusion by excentric yellowish-white firm material. No thrombus is seen. Distal to this point the lumen is adequate and the wall is unremarkable. Minimal thickening is noted in the right coronary artery. The aorta and its branches arise and course in a normal fashion. There is normal elasticity and the lumen is of average caliber. Scattered yellow plaques are seen throughout. * * *"

Microscopic examination of the cut section of the coronary artery showed "marked atherosclerotic thickening with reduction of the lumen to a slit."

Petitioner called Dr. Saul Lieb as an expert medical witness in support of the theory that the death was one which qualified as an accident "arising out of and in the course of employment" within the meaning of our cases. Like Dr. Wilson, Dr. Lieb is a specialist in internal medicine and certified as such by the American Board of Internal Medicine; he is associated with several hospitals as an internist. Dr. Lieb examined a series of electrocardiograms (EKG) of Walck that had been taken annually between March 31, 1952 and June 27, 1961 either by or for Dr. D. T. DuBow, the plant physician, as part of the annual medical examination which was apparently given to all employees. As noted thereon, each one was read by Dr. DuBow to be normal. However, Dr. Lieb said he would interpret seven of the ten plant EKG's as showing "minor deviations from the normal," and "as being suspicious of myocardial involvement." Each of them, although separated by the intervening years, showed the same degree of involvement. It would be "very technical" to explain the condition beyond a minor deviation, but he thought one trained in cardiology would agree with his impression. However, he admitted that the vast majority of general practitioners could call the EKG's normal. He added that the condition is very often seen as "a residual of many, most anterior myocardial infarctions," as a Dr. Dressler had pointed out in an article many years ago. So, as Dr. Lieb continued, "when you see it for the first time, while it is not a striking pattern, it is striking in that you *may* have a thought that *perhaps* this *may* represent a residual of an old infarction." (Emphasis added.)

Here it may be noted that Dr. Jerome G. Kaufman studied the EKG's and testified about them for respondent. He too is a specialist in internal medicine and cardiovascular diseases and has so specialized since 1927. The trial judge observed that he had never heard Dr. Kaufman's qualifications questioned by anyone. Dr. Kaufman said that the EKG's "fall within the normal scope of electrocardiograms as you

see them in your office," and one should not make a diagnosis of coronary disease based upon them.

The record shows that Dr. DuBow had taken these plant EKG's to Dr. Wilson for examination. Dr. Wilson, who, as we have said, is also a specialist in internal medicine as well as the decedent's family physician, interpreted them as being normal. In addition, it appears that Dr. Wilson took three EKG's of his own on January 14, 1956, March 26, 1959, and February 19, 1960. In his opinion, they too were normal. Dr. Kaufman also examined them and agreed that they were within the normal range.

Dr. Lieb stated that in addition to his review of the EKG's he considered a number of complaints made by Walck at respondent's clinic beginning on July 30, 1956 and continuing at intervals until the fatal heart attack on March 14, 1962. These complaints generally related to nervous indigestion, stomach pains, pain in the chest, soreness of chest muscles, pulsating pain in chest, and on March 14, 1962 severe pain in chest, shortness of breath and a burning sensation in the throat. Based on the EKG's and these complaints, it was his opinion that Walck had definite evidence of arteriosclerotic heart disease with symptoms of coronary insufficiency in the several years prior to his death. He testified further that on such a diagnosis he would give patients certain advice and medication. In elucidating, he said he would advise them to "avoid any emotional stress and strain and to not let the various details of existence get to them too much because this has an adverse effect upon the coronary arteries. Emotional stress and strain will precipitate angina and coronary insufficiency." Further, he would tell them "to live in moderation, to get a proper amount of rest, sleep and vacations," and to avoid overweight. For example, he noted that Walck was 5'8-3/4" tall and weighed 184 pounds and that his lowest weight appearing in the records was 178-3/4 pounds. In his view, Walck would have been much better off weighing 15 to 20 pounds less in order to spare his heart the burden of carrying around excess weight.

[I]n summary, I would say that I feel we have here a case of coronary disease that was aggravated by the emotional stress and strain arising from his employment in the last year of his life, and the fatal outcome of the myocardial infarction, which occurred while he was at work was favored by the fact that it was superimposed upon far advanced degree of coronary disease.

As to medication, Dr. Lieb said he would prescribe nitroglycerin to be carried around and to be put under the tongue when pain occurred. He would put such patients on sedation, "if they are nervous, tense people," and although not too efficacious he would give vasodilator drugs "for whatever benefit they may provide." He considered it important that such patients understand their symptoms. On being asked to assume that on March 14, 1962, in the normal course of his work Walck suffered a myocardial infraction due to coronary sclerosis, the doctor said that having in mind all the records he had examined, it was his opinion that Walck had at that time "a rather far advanced degree of coronary disease."

The doctor said he would advise such a patient not to submit himself to situations in which he might "become aggravated or upset." When asked what advice he would give about engaging in politics he said:

"I would advise him to avoid whatever stressful situation that he could. Now, these people, if you know what they have, you usually tell them to restrict whatever activities, emotional stress and strain that he might have to contend with to make a living, and you tell them to avoid any outside activities outside of making a living, that will induce any emotional stress and strain because that will spare the heart, and you have many who will select those activities which are absolutely essential and to avoid others."

Dr. Lieb was given a long hypothetical question, the core assumption of which was Mrs. Walck's testimony to the effect that in the year prior to her husband's death she "observed that he was suffering from nerves and tension," that she "could see evidence of tension on his job when he would

come home at night appearing aggravated, irritable and upset," and that "he told her he was concerned about his job." The hypothetical question also assumed: (1) a description of the Grote incident; (2) Mrs. Walck's statement that after the advent of Grote as his superior, her husband complained of nervousness, tension, chest and right arm pains and a feeling of pressure in the chest, and that "he *began* seeking medical attention for his nerves and for this tension," (Emphasis added.); (3) that, although active in politics, decedent was happy and relaxed in that work and had no undue hardshipsor conflicts in that area; (4) that upon seeking advice from the "medical authorities" who examined him, he was reassured that there was nothing wrong, "just nerves and tension" and he was never advised that he had a heart condition; and (5) that the condition of Walck's employment during his last year was that "he went about his work with a constant feeling of concern, uncertainty, tension and nervousness." On the basis of these various assumptions, and the doctor's familiarity with the records and EKG's, and the diagnosis he had made of Walck's underlying condition, and "considering the tension state he was working under," he was asked if he had an opinion "as to whether [Walck's] work and the effect which his work had upon him, as an individual, and the thoughts and beliefs which developed in him as regards his work status * * * contributed to the attack which he suffered while at work on March 14, 1962." He gave an affirmative answer, which concluded:

In further explanation of the opinion as to causal connection between the work and the heart attack, Dr. Lieb said that the emotional stress and strain had to be of an appreciable nature. Although the Grote incident, of itself, would not support his conclusion, he accepted as true that it did produce some tension — because he was asked to assume that it did in the hypothetical question. On being asked if he would expect that this one "occasion of [Walck's] boss coming in and standing at his desk" would have a more

"traumatic stressful effect" than Walck's long medical history, the doctor said:

Well, I don't want to compare the two because I was not given how it affected him. I was told that this particular stress incident did affect him, and I am accepting it.

If, however, he assumed that Walck was concerned about these other illnesses, he would say that they contributed to his cardiovascular difficulty. In any event, he said that he assumed the condition of emotional stress and strain which was related to Walck's work became more apparent and continued all during the final year of his life. Such assumptions were necessary to his opinion. With respect to the political activities as a tension-causing factor, he dismissed them because in the hypothetical question he was told that they did not bother Walck, and he "accepted that."

In support of its position that petitioner's claim of proximate causal relation between alleged work-induced emotional stress and strain and the fatal heart attack amounts to speculation and conjecture, respondent undertook to show decedent's long medical history. That history, which will be detailed hereafter, demonstrates beyond question that Walck suffered from anxiety, tension, nerves and worry about his health for many years prior to the Grote incident and long before he allegedly "began" treatments therefor by Dr. Wilson. It shows also that at no time over the years did he ever relate those conditions to his employment.

Although Walck's complaints began early in his employment with respondent, a recital of them can be deferred until Dr. Wilson's professional and social relations with him are considered. In our judgment, the doctor was unduly criticized by the trial court for his appearance in the case. It is obvious that he is not a "professional witness" and was not accustomed to appearing as such in the Workmen's Compensation Division. What seems to have been overlooked is that the doctor produced his handwritten office records dating back to 1956 and containing Walck's com-

plaints and the treatment given down to a little over two weeks before the death. They were all *ante litem motam* records and as such entitled to considerable probative value.

The record begins on January 10, 1956 at which time Walck had an acute low back sprain. On January 14 the back had improved but the patient wanted a check-up. The history given on that date is significant:

For several years has had epigastric fullness and distress, nausea, belching, gas, bad taste in mouth. * * * Symptoms are definitely related to nervous tension.

For past few months has been troubled with shortness of breath. Claims to be short of breath now but isn't. Father died of coronary and 1 brother age 44, has had 3 coronaries already. * * *

Weight has slowly climbed from 148 when he went in Army to 187 now. Smokes 2-3 cigars, doesn't inhale, they are laxative for him. System review otherwise negative. Blood pressure 130/80 * * *. Complete exam, including rectal negative, EKG, urine and fluoroscope negative, Rx—Complete G. I. series.

Further visits followed. Eleven months later on a visit of December 6, 1956, Walck had "numerous psychosomatic complaints, headaches, left upper and lower quadrant pain, gas, shortness of breath, pains in chest." The examination was negative and reassurance was given. On August 14, 1957, Walck complained of low back pain, pain and tenderness in left lower quadrant. Examination showed albumin in the urine and patient was sent to hospital to have this condition checked. Apparently around this time, Dr. Gentile, a urologist, diagnosed a prostatitis and began treating him. On September 5, 1958, he had a cold and bursitis in his right shoulder and elbow; medication was given. On March 26, 1959, the doctor saw Walck at home and at the office. He had "severe tension symptoms, anxiety and tightness in the chest." On examination, pulse was 72, blood pressure was 135/85, heart and lungs were negative, fluoroscope was negative, and an EKG was normal, *i. e.*, no change from the earlier one. On February 19, 1960, he complained of having a cold for four weeks and now of "heavy pressure in chest when lies down, choking in throat, pains in abdomen,

back and down left leg, pains in head, several others. Very worried and depressed." EKG was again normal. February 25 and March 3, 1960 — same complaints and sore throat. The doctor prescribed "various tranquilizers, anti-depressants and anti-spasmodics." June 13, 1960 — a cold. On June 16, 1961, he had "muscular pains in upper anterior chest and throat for three weeks. Great anxiety." A laryngoscopy was negative; "heart and lungs O. K."; some mild tenderness of muscles of neck and upper chest." Equagesic was prescribed — a combination of tranquilizer, some aspirin and muscle relaxant; November 20, 1961, same complaints — Equagesic renewed; February 26, 1962, complained of "low backache, flatulence and crampy abdominal pain. Been taking antibiotic — saw (Dr.) Gentile — prostate is O. K. * * * Low back is a little tender." Dr. Wilson last saw Walck at the hospital on March 14, 1962 when death occurred.

In addition to seeing him professionally, Dr. Wilson saw Walck frequently around town and at meetings. In his opinion, Walck was a hypochondriac; because of the family history he worried and was tense and anxious about his health, not only about heart disease but about cancer as well. One of his relatives had died of cancer and he had had a small cancer on an ear lobe. Dr. Wilson said the anxiety and tension were part of Walck's nature; he "couldn't help it." Dr. DuBow, respondent's plant physician, consulted Dr. Wilson, as Walck's family doctor, about his many complaints at the clinic. As has been indicated above, Dr. Wilson, as the specialist, agreed that Dr. DuBow's EKG's were negative; and both doctors were in accord that Walck was a hypochondriac. They "could never find any evidence" of coronary artery disease. Dr. Wilson said there was no reason why a person with hypochondria could not die of heart disease.

After the death, Dr. Wilson saw the autopsy report and, on that basis, agreed that Walck had had coronary artery disease for an extended period of time before his death. He

also conceded that it was quite possible that the chest and other complaints Walck made to him could have been indicative of coronary artery disease.

In view of the claim that decedent's anxiety and tension was related to his employment, it is important to review his long history of complaints to Dr. DuBow at respondent's clinic. Our count shows 62 clinic visits between June 15, 1951 and the death on March 14, 1962, excluding diathermy treatments for back and other pain and treatments for hand lacerations and other injuries which occurred away from work. Some of the visits must be set forth in the following excerpts:

**1951**

| | | |
|---|---|---|
| July | 19 | Month after employment began Feels sick to stomach, has gas pains. |
| Oct. | 22 | "Does not feel well; says aches all over. * * * Went home 11 a.m." |
| Oct. | 26 | Complains — sore throat; requested that it be painted. |

**1952**

| | | |
|---|---|---|
| Feb. | 25 | Pain in back. |
| Apr. | 4 | Sore throat. |
| July | 18 | "Says feels shaky—and just threw up. No pain. Feels clammy." |
| Aug. | 21 | "Has backache—says for about 1 week, weakness and soreness in back which lasts about 4 hours each day." |
| Dec. | 19 | "Complains of pain in abdomen * * *." |

**1953**

| | | |
|---|---|---|
| Feb. | 25 | "Complaining of sore back for about 1 week. * * * Says carried a typewriter and thinks that may have been cause." |
| June | 26 | Pain in right forearm. |
| July | 7 | X-ray cervical spine * * *. Some slight cervical scoliosis, otherwise negative. "Advised because of presence of hypo-anaesthesia of right upper extremity to seek neurosurgical advice. Dr. N. T. Fitch recommended and can take X-rays of cervical region and chest with him." |
| July | 29 | Complaining of severe pain in abdomen. Points to l.l.q. [left lower quadrant] * * *. Nauseated and some diarrhea. * * * Impression-food poisoning * * *. May be excused to go home . Medical case. * * * Taken to Somerset Hospital. Out 2-½ days. |

| | | |
|---|---|---|
| Aug. | 11 | "Non-occupational report * * * consultation with Dr. Culberson, believes may be dealing with herniated disc at C5 and C6." |
| Nov. | 16. | Back became very sore while bowling. * * * Given diathermy * * * went home. |
| Nov. | 25 | Complains of severe headache   Bed rest. * * * Given codeine. |
| Dec. | 1 | Requests to have temperature checked. |
| Nov. | 28 | Pain after eating about one hour. Past 2 months. * * * Tender 2″ above umbilicus; advised to see Dr. Cook. |

**1954**

| | | |
|---|---|---|
| Oct. | 25 | Complains of feeling weak all over and says has pain in chest—points to area of sternum. Says has felt like this for past four days. * * * Says pain also goes into abdomen. * * * Has epigastric distress, feels bloated and pain in chest for 4 days; did not consult family doctor; abdomen slight distention but no local spasm * * *. Advised to see family doctor if complaints persist. |
| Dec. | 27 | Says still has pains in chest and stomach intermittently for 3 days. Is nauseated now. Exam. Abdomen soft. Slight epigastric tenderness; heart, no murmur, lungs clear * * *. |

**1955**

| | | |
|---|---|---|
| Jan. | 6 | Says has sore throat. |
| Jan. | 25 | Says he has cough—headache—eyes hurt when he reads —Legs go to sleep—upset stomach; says feels hot and sweaty. Examination: Eyes, ears, nose, throat and lymph glands negative * * *. Heart no murmurs * * *. |
| Feb. | 22 | Requests light treatment (?). Pain back of neck. Strained neck while painting at home. |
| Aug. | 5 | Complains of sore throat and stopped up feeling in ears, 4—5 days. Pharynx appears normal, cervical nodes not palpable. Ear drums appear normal. |

**1956**

| | | |
|---|---|---|
| Jan. | 19 | Has had low back pain for about a week. Under care of Dr. Wilson. Says Dr. Wilson suggested diathermy. Requests diathermy. * * * O. K. to provide daily diathermy to lower back on medical basis. |
| Jan. | 20 | X-ray of lumbar and lumbo sacral spine. Taken. Some hypertrophic arthritis of lumbo. 1, 2 & 3. To take to family doctor. |
| Apr. | 10 | Non-occupational back complaint. Requests heat treatment. O. K. to give treatment. |
| July | 30 | Says he has nervous indigestion. * * * Dr. DuBow ordered a triple bromide. |
| Oct. | 22 | Complains abdominal fullness, cramps, diarrhea beginning in P.M. on 10/21. |

**1957**

Mar. 15    Requests exam of sore on left ear which he says has been present about 3 months and has not healed. * * * It could be neoplastic. Advised employee to consult family doctor or skin specialist.

Apr. 11    Infra-red to lower back—at employee's request.

Apr. 28    Complains of aches and pains all over, back hurts, bridge of nose swollen * * *.

**1958**

Apr. 28    Feels as if getting cold—aching and soreness around eyes, tender over right upper aspect of nose. * * *.

June 18    Headaches, nausea and sore throat; sent home.

June 19    Took pills given 6/18. Says still does not feel too well. * * * Wants blood pressure checked.

Nov. 28    Started having pain in back on Saturday morning. Had had milder pain past week—was unable on Saturday to get up from chair or get out of car. Went to doctor (osteopath) on Tuesday and received diathermy treatment and manipulation.

Dr. Hilton could find nothing wrong with back and also prescribed medication to relieve pain and tension and also some phenobarbitol. Dr. Hilton suggested enema—but employee couldn't take it. This morning employee had severe pain in right breast. Gets a pulling sensation when he straightens up. Health counselling. (Dr. Merrill Complaining low back pain—about 2 weeks; pain and soreness right side chest—epigastric pains and pressure with radiation to chest. Had complete G. I. series earlier this year—results negative. Chest pain appears to arise from anterior pectoral muscles. Spine is straight—no muscle spasm * * *. Knee and ankle jerks active. Heart sounds normal. Question of chronic prostate infection. Suggest recheck of prostate.

**1959**

Feb. 10    Asks to have M. D. check his throat. Says it has been sore for 3 weeks. Says saw family doctor but throat is no better. Seen by Dr. DuBow.

After examination Dr. DeBow advised examination by a laryngologist.

Feb. 23    Out 1 week. Says had cold and sore throat. Says was treated by Dr. Cooley.

Aug. 19    Requests that his temperature be taken—Temp. 98. Says he doesn't feel well—feels as though something is "sitting on stomach. * * *."

**1960**

Jan. 19    Out since 1/15 due to pains in chest and below ribs—feels bloated. Complained of headache, sore throat and

difficulty swallowing. Did not call family doctor. Stayed in bed—took aspirin. This A.M. feels "funny"—cannot describe sensation. Temp. 97. States usually runs subnormal temp.

(Dr. Merrill). Larynx appears O. K. Is Febrile. Has multiplicity of subjective symptoms, pain in chest and back, difficulty swallowing. O. K. to return to work today.

Mar. 25    Says received splinter—right hand—while moving tables at J. M. Removed.

Sept. 26   Complaining of sore throat since Thursday. Has cold Temp. 97.8 Requests Dr. examine throat.

(Dr. Merrill). Appears throat not remarkable. Lungs clear; ears O. K. Coricidin. Can work.

Oct. 20    Says lifting a desk in record section and felt twinge in right elbow at about 1:30 P.M. on 10/19/60. Today has trouble making a fist and it causes a shooting pain in his elbow. X-ray right elbow.

X-ray negative.

Dec. 27    Laceration right middle finger which happened at home on 12/26/60. * * * Band aid * * * advised to check with family doctor if complaints persist.

**1961**

June 16    Says both eyes are bothering him; left more than right. For past few days they have been tearing. Has been using B. A. eye wash at home. Wishes to see doctor.

Dr. DuBow—Tear-ephrin (?) each eye—before going home.

Oct. 13    Deep laceration of right thumb. Says last night about 12 midnight, when he reached to turn on water, cut thumb on sharp edge of porcelain. Cleansed with $H_2O_2$. Informed employee he needed more than first aid. * * * Says will go to Somerset Hospital Emergency Room. * * *

Dr. DuBow. Laceration approximated with (?) adhesive; dressed.

Oct. 16    Further examination and treatment of lacerated thumb.

Oct. 19

Nov. 20    Has muscle soreness at pectoralis bilaterally.

Nov. 27    Had severe pain while urinating. Pain started in groin and radiated to rectum.

Dr. DuBow. Rectal exam negative, Prostate and (?) negative; scrotal contents negative, no pericardial (?) tenderness; no evidence of hernia; to check urine.

Milltown TAB No. 1

Urine exam negative.

Dec. 14    Dr. DuBow. Mild distention of abdomen; generalized aches. Milltown 400.

**1962**

Jan.  2    Complains of laryngitis which started on Sunday; has had a cold for approximately 1 week. Also complains of

intermittent chest pains (about middle of chest) lateral aspects—under both arms. Would like to see M. D.

Dr. DuBow. Has laryngitis with soreness in chest; chest clear.

Record shows prescription by Dr. DuBow.

Jan. 18    Out since 1/4. Onset about 2 weeks ago with sore throat, post-nasal drip and generalized body aching. Saw Dr. Wilson at onset of symptoms who gave pills. Has been taking pills for about 3 weeks, plus aspirin. Temp. has always been subnormal—about 97.4. Says has G. I. complaint (will explain to own M. D.) and plans to call Dr. Gentile today for appointment. Says he feels "worse" than he did on 1/4/62 but would like to try working. Says at times has pulsating dull pain beneath both axilla areas. Says has been present for about 1 month.

(Dr. DuBow) Has some diarrhea—spasm of colon. Prescribed.

Jan. 24    Chest pain. Dr. DuBow prescribed Trelafon 2 m.g. etc.

Mar. 14    The fatal heart attack.

The clinic records show also that eight x-rays of Walck's chest were taken between January 25, 1955 and June 27, 1961. They were negative. Walck's last annual physical examination, including an EKG, was given by Dr. DuBow on June 27, 1961. On that occasion Walck said he was under Dr. Wilson's care for general aches and pains which he had been told were due to tension.

This opinion has been burdened with many references to Walck's medical history, complaints and treatment for a purpose. In our view, that data demonstrates overwhelmingly that his nervousness, tension and anxiety did not come into being during the last year of his employment. Rather, these conditions had existed for many years and obviously emanated from constant worry about the state of his health. Dr. Wilson's records and those of respondent's clinic were made long before the fatal heart attack when there were no thoughts of any workmen's compensation claim, no apparent conflicts of interest to color anyone's viewpoint or motivation, and no reason not to faithfully and truly record an employee's complaints. In fact, every indication is that of a tolerant attitude on the part of the respondent's plant physician toward the

many complaints even though they had no employment connection. So, the records take on substantial significance not only for what they do reveal as the cause of Walck's anxiety and tension, but also for what they seem to exclude as a possible cause. At no time over the years do either Dr. Wilson's notes or respondent's clinic records give the slightest hint that any of the worry was associated with his employment or his job security.

Dr. DuBow did not appear as a witness and the record shows no reason therefor. In view of the elaborate clinic reports of his contacts with Walck, we cannot say that the doctor's absence as a witness possesses sufficient adverse probative force to require a result different from that which we have reached in the case.

The above outline of Walck's history brings us back to the testimony of Dr. Kaufman. The doctor was given the same hypothetical question that was put to Dr. Lieb. In answer he gave the opinion that there was no causal relation between Walck's sudden death and his employment. It was his view that the death came from the progressive nature of the coronary arteriosclerosis. This was shown by the autopsy which revealed that the left anterior descending artery was almost completely occluded by atherosclerotic process. The doctor pointed to the pathologist's finding that the left coronary artery was moderately thickened by yellow firm focally calcified material, and that the process was most marked in the left anterior descending branch approximately one-third of the way down the course. Dr. Kaufman then noted the finding that at that point there "was almost complete occlusion by excentric yellowish-white firm material." On microscopic examination the condition was described as "marked atherosclerotic thickening with reduction of the lumen to a slit." The doctor referred also to the autopsical doctor's statement that "no thrombus" was seen. This meant that "there was no fresh pathology there." Consequently he expressed the firm view that since the process was purely occlusive the "natural process of atherosclerosis in this

branch, the left anterior descending branch, caused [Walck's] death."

The doctor was not cross-examined by petitioner's attorney. In this connection it may be noted that Dr. Lieb said he was not aware of any autopsy. Consequently, in giving his opinion as to causal connection between the alleged employment anxiety and the death, he did not have the advantage of the actual and visual finding of the physical nature of the occlusion, which finding convinced Dr. Kaufman that it came from the natural progress of the disease. What, if any effect, the finding would have had on Dr. Lieb's opinion cannot be known. After the autopsy report came into the record, Dr. Lieb was not recalled to discuss it.

I

This Court held in *Dwyer v. Ford Motor Co.,* 36 *N. J.* 487, 493 (1962) that the onus of establishing a connection between a heart attack death and work strain, of whatever nature, rests on the compensation claimant. This means that the petitioner has the burden of showing by the preponderance of the believable evidece that an alleged employment strain in reasonable probability contributed in some *material* degree to the precipitation, aggravation or acceleration of the existing heart disease and the death therefrom. 36 *N. J.* at 493. "Some material degree" means an appreciable degree, a degree greater than *de minimis.* And the facts of the situation under examination in their totality must demonstrate such causality by the greater weight of the credible evidence.

Put in conventional terms, the heart attack, to be compensable, must arise out of the employment. That is, it must be due in some realistic sense and material degree to a risk reasonably incidental to the employment; the attack must issue from or be contributed to by conditions which bear some essential relation to the work or its nature.

In this case, recovery is sought on the theory that decedent was tense and nervous for a long period of time—

the last year of his life—because of a feeling of insecurity about his job; he worried that he might lose it. But such worry, which came into being because of the inherent nature of the employee and which is not shown by the greater weight of the evidence to have had a reasonable basis in fact, cannot be said to give compensability to a heart attack which is attributed to emotional strain resulting from such unfounded or imaginary worry. In other words, if the nature of an employee is such that he is a worrier, the mere fact that he becomes unnecessarily tense and nervous as to whether he is going to keep or lose his job, without more, would not make a heart attack compensable, even if the attack did result from that worry. That kind of anxiety or tension cannot be considered a risk arising out of the employer's work. If worry, about job security alone, which produces a heart seizure would establish compensability, the employer would become an insurer against such attacks.

■■ Dr. Lieb accepted the hearsay statements of Mrs. Walck that after Grote became her husband's superior he worried about his job security. The doctor translated that into a "climate of tension" which continued throughout Walck's last year of life. We find the record barren of any substantial basis for the existence of such a fear. There is nothing to show any dispute or disagreement between Walck and Grote, or any criticism of Walck or his work by Grote, or any adverse report about Walck by Grote to respondent. Under the circumstances, we hold the view that petitioner clearly failed to provide adequate credible evidence to establish that her husband's heart attack was the product of an employment-induced risk, as we have defined such a risk above.

Moreover, we are satisfied that the overwhelming evidence shows that Walck suffered from worry, anxiety and tension for years before his death and that such conditions arose from concern about his health and not about his employment security. His family history of heart disease and cancer (including his own minor ear cancer) made him a responsive

victim of hypochondria. It is impossible to read his medical records without becoming convinced that his concern for his health was a paramount consideration of his life and that he would have worried over it no matter where he was or what he was doing.

Finally, it must be said also that on all of the proof in the record which Dr. Lieb had before him for consideration, in our judgment, his conclusion that Walck suffered from employment-induced emotional strain which caused or contributed to his fatal heart attack is fraught with speculation and conjecture. Our study of the credible evidence satisfies us that if anxiety and tension played a responsible role in the heart attack, those conditions were related to years of worry about his health and had no origin in his employment. Moreover, on the basis of the autopsy report and the description of the death-producing occlusion of the coronary artery involved, and irrespective of whether emotional strain due to worry did or did not accelerate its course, the greater weight of the evidence supports Dr. Kaufman's opinion that a fatal heart attack resulted from the ordinary progress of Walck's coronary artery disease.

## II

Our determination that Walck's fatal heart attack did not constitute a compensable accident makes it necessary to consider the alternative ground on which the trial judge granted compensation. In finding liability, the Judge of Compensation held that (1) respondent's plant physician had failed to properly diagnose, advise and treat Walck before the heart attack on March 14, 1962; and (2) that under the "humane instincts" doctrine announced by this Court in *Dudley v. Victor Lynn Lines, Inc.*, 32 *N. J.* 479 (1960) the same physician had failed to properly diagnose and treat Walck when he came into the clinic at 8:45 A.M. on March 14, 1962.

In the cited case, Dudley, a truck driver, drove from respondent's terminal in Kearny, N. J. to lower Manhattan, New York City, arriving there about 10:45 A.M. Around 11:25 A.M. he complained that he was not feeling well and asked his helper to call the terminal and report that he was sick. The helper did so at about 11:30 A.M., reporting to their superior that Dudley was sick and wanted a relief driver. The superior said "as soon as he could he would send somebody * * * over, and in the meantime for him [Dudley] to sit in the cab." After a while the helper called Dudley's wife at his request and asked her to have her brother come to New York and pick him up. The wife was unable to reach her brother. She then telephoned the terminal at about 12:30 and spoke to her husband's superior. He informed her he knew of Dudley's illness, that she should not worry as he would "get in touch" and she should call back later. She did so at about 1:00 P.M. and was told by the same person that he had gotten in touch with New York, that her husband was a little better and that he would "send help out and get a doctor." He reported that she was not to worry, "there was a truck somewhere." He said also that she should stay home in case there was another call, and "not to worry, that they get a doctor."

The helper continued to unload the truck until 2:00 or 2:30 P.M. Dudley remained in the cab. According to the helper, he looked worse. He was sweating, coughing and spitting, and he was restless. Sometime between 2:00 and 2:30 the helper was told that Dudley had fallen from the cab. An ambulance was called and arrived around 2:30 at which time Dudley was pronounced dead of a heart attack. A relief driver arrived from the employer's terminal at 3:00. No doctor had ever been called by Dudley's superior. It was only when the wife again called the terminal at 4:30 that she was told of her husband's death. Two medical experts testified that the death was probably attributable to Dudley's failure to receive prompt medical attention.

We held that the failure of respondent's agent to procure medical aid for Dudley during the three-hour period was negligent, and therefore his widow was entitled to workmen's compensation. In his opinion for the Court, Justice Proctor said that a petitioner must prove negligence in order to qualify for compensation for it is "the negligence that satisfies the statute's requirement that the death arise out of the employment." 32 *N. J.* at 494.

The *Dudley* doctrine may be considered as having application in two situations which are relevant in the case before us. *First,* although under ordinary circumstances an employer is under no duty to provide medical aid or treatment for non-work-connected illnesses which arise during the course of the work, if he should voluntarily undertake to do so, he must exercise reasonable care in supplying such aid. That is, his duty is to provide a doctor who will and does exercise in the diagnosis and treatment of the patient the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field. *Schueler v. Strelinger,* 43 *N. J.* 330 (1964). If the doctor chosen fails to satisfy that standard and if, as a result of that failure, the employee dies, the doctor is guilty of professional negligence or malpractice. Under such circumstances, the doctor's negligence must be treated as a condition of employment. *Second,* if an employee becomes ill at work from a non-work-connected cause and is helpless to provide medical aid for himself, the employer must exercise reasonable care to put within reach such aid as the emergency may require. If the employer provides medical aid, the doctor, in diagnosing and treating the stricken employee, must meet the standard of professional care described above. If he is negligent by that test, under *Dudley* any injurious results will be deemed to arise out of the workman's employment.[1]

---

[1] *Dudley* and, indeed, this case do not deal with the situation when a workman is stricken at a remote place and beyond the reach of help. See *Dudley v. Victor Lynn Lines, Inc., supra.* 32 *N. J.* at 489, 493.

In this case, at the trial, petitioner expressly disclaimed any charge of "carelessness or negligence." The theory on which compensation was sought was that "there was a failure to diagnose decedent's health status" and, because of that failure, "decedent suffered injury which contributed to his death." In short, the claim was that respondent's plant physician, Dr. DuBow, had made a mistake in diagnosing Walck's complaints as the product of hypochondria rather than of coronary disease over the long period prior to the fatal heart attack, and particularly on the morning of the fatal attack, and that that mistake contributed to the death. This view of the petitioner's case was emphasized during the cross-examniation of petitioner's medical expert. Dr. Lieb was asked to assume the facts set out in respondent's clinic records and to state his opinion as to whether the conduct of the plant physician was "sufficiently contrary to good medical practice to support a malpractice claim." Petitioner's counsel objected and the objection was sustained. Respondent's attorney, in explaining the question, indicated that it was based on the *Dudley* doctrine. The case then proceeded and at no time was any attempt made by petitioner to show that Dr. DuBow was guilty of a negligent departure from the standard of care exercised in similar situations by the average member of his profession practicing in his field. *Cf. Schueler v. Strelinger, supra,* 43 *N. J.* at 344.

It must be remembered that we are dealing with the conduct of a doctor selected by the employer to be in charge of its medical department or clinic. Although the employer had no obligation to provide medical services for illnesses or injuries which did not arise out of and in the course of employment, it plainly appears, at least as far as Walck is concerned, that he was permitted over a long period of years to bring all his complaints and ailments, regardless of compensability, into the clinic and to Dr. DuBow for attention. Since, inferentially at least, the employer approved such general medical service, it would follow that (aside from personal negligence in selecting an incompetent

doctor — which is not suggested here), if the doctor were negligent within the *Schueler v. Strelinger* test, in diagnosing or treating a non-compensable disease or condition, the employer would be liable for consequent injury to the employee. In that event, as *Dudley* indicates, the doctor's malpractice would be an incident of the employment. But there must be proof of the doctor's departure from medical standards governing diagnosis and treatment. As *Schueler v. Strelinger* says, a physician is not "liable for an honest mistake in diagnosis or in judgment as to the course of treatment taken." 43 *N. J.* at 344–345. Therefore, since Walck's heart attack did not have a work-connected origin, in the absence of proof of the doctor's negligent diagnosis or treatment the death cannot be considered as arising out of an employment condition.

In this kind of a case, evidence of deviation from accepted medical standards must be provided by competent and qualified physicians. Ordinarily, a court cannot be permitted to speculate as to whether the diagnosis and procedure followed by a treating physician conformed to the required professional standards. *Id.*, 43 *N. J.* at 345. No competent proof of professional negligence on Dr. DuBow's part was offered by petitioner; in fact, her attorney prevented exploration of the subject when opposing counsel sought to question, in that regard, claimant's only expert. Under the circumstances, the *Dudley* rule provides no basis for recovery here.

Petitioner seems to argue that the evidence is sufficient in its present form to establish the required degree of negligence. We think not. Dr. Lieb, who it must be recalled is a specialist in internal medicine, said, in expressing his personal opinion, that if he had been the plant physician he would have told [Walck] that he had a coronary disease and that he should consult his family physician as to further advice. He said that he believed the usual policy in such plants is to recommend to people "to have their own physicians take care of them in situations of this type." These observations

should be considered in light of the actual facts in the record. Dr. Du Bow is a general practioner. Over the period of Walck's employment, Dr. DuBow secured ten EKG's. In his opinion, they showed no departure from a normally functioning heart. Moreover, on many clinical examinations performed by himself and other doctors in his clinic, Walck's heart sounds were normal and no murmurs were found. He could find nothing wrong with the heart. But he knew that Walck was under the care of Dr. Wilson, a specialist in internal medicine. He consulted on many occasions with Dr. Wilson and also took his EKG's to Wilson for his interpretation. Dr. Wilson, who had taken three EKG's of his own, agreed that all of them were normal. Dr. Kaufman, another qualified internist, examined all the EKG's and concurred in the opinions of Drs. Wilson and DuBow. And Dr. Lieb conceded that the minor deviation which he claimed appeared therein would probably be interpreted as normal by the vast majority of general practitioners. On such a record, it could not be said fairly that Dr. DuBow's interpretation of the EKG's was evidence of negligence or of a departure from accepted medical practice.

Additionally, Dr. Wilson knew Walck well, both socially and as a patient, for years and he knew the nature of the man. He knew the family history of heart disease and was aware that over many years Walck had been tense and anxious about his own possible predisposition toward it. The doctor obviously was convinced, in spite of the many complaints of chest and abdominal pains and assorted difficulties, that the complaints were hypochondriacal in nature and he prescribed tranquilizers and sedatives accordingly. We find no basis for concluding that his *ante litem motam* conclusions were not made in good faith. But if his diagnosis was mistaken, and even assuming his diagnosis was negligent (and there is no competent proof that says so), his failure would not be chargeable to respondent. He was Walck's family physician and not in respondent's service. Nor could any negligence of his be im-

puted to Dr. DuBow, for there is neither reason to believe that Dr. DuBow did not regard him as a capable specialist in his field, nor is there competent evidence to indicate that he was not so qualified.

It is clear that Dr. DuBow and Dr. Wilson discussed Walck's complaints, tension and worry on a number of occasions. As the result of his many contacts with Walck— certainly, as the clinic records show, sympathetic and tolerant contacts—Dr. DuBow concluded that Walck's chest, abdomen and arm complaints were psychosomatic in nature. All of the symptoms were subjective; even with the aid of EKG's, x-rays, fluoroscope and clinical examinations, he could not discover objective evidence of organic disease. Moreover, the subjective complaints seemed to be relieved through tranquilizers and sedatives. Then, as further precaution, he turned to the specialist, Dr. Wilson, who informed him of the similar complaints received from Walck over the years, and of his concurring diagnosis. As Dr. Wilson explained their joint study of Walck, they had never been able to find sufficient evidence to warrant a diagnosis of heart disease. In these circumstances, it does not seem fair or realistic to demand more of Dr. DuBow. If both he and Dr. Wilson were mistaken in their diagnosis, as the autopsy seems to indicate, on the record presented here it was an honest error of judgment, and not the result of a negligent departure from medical practice standards.

This brings us to the morning of March 14, 1962 when the fatal heart attack occurred. The events of that morning cannot be appraised in isolation. An evaluation of Dr. DuBow's conduct must be made against the background of his total experience with Walck, and his honest diagnosis of periodic but long-existing psychosomatic complaints of the same type Walck complained of at 8:45 A.M. on March 14.

Walck came into the clinic from his "right next door" office, complaining of severe pain in chest, shortness of breath and burning sensation in throat. It is obvious from the notes that the nurse immediately put him to bed and

Dr. DuBow was on the scene in a very few minutes. His notes describe a complaint of "severe chest pain arising from the tip of the sternum and traveling up to neck; pulse 72 * * *." The doctor "reassured" Walck and ordered a triple bromide as well as sedatives. The nurse's note reveals that the triple bromide was given at 8:55, so that Dr. Du-Bow had made his examination and his notes in less than ten minutes after Walck's appearance. The pain continued and radiated to the back and Dr. DuBow ordered 50 milligrams of demerol (a sedative and anti-spasmodic) which was given at 9:20. The pain continued to persist. Dr. DuBow noted that it was radiating to the left hand and at this time his impression was that Walck "had developed an acute coronary thrombosis." His note says morphine sulphate was ordered and Dr. Wilson was contacted. Dr. Wilson advised sending Walck to the emergency room of the Somerset Hospital. The record shows that the morphine sulphate was given at 9:40. The final note by Dr. DuBow says "sent to Somerset Hospital with nurse. Oxygen to be administered." As noted earlier, Walck arrived at the hospital, via a company ambulance, at 10:06 A.M. and died at 10:20 in the emergency room.

It is obvious that, when Walck came into the clinic on March 14, Dr. DuBow concluded that this was another instance of his psychosomatic complaints and that he would respond as he had in the past with rest and sedation. In his review of the case which was attached to the clinic records offered in evidence by petitioner, Dr. DuBow said: "Mr. Walck was seen frequently for minor illnesses, both organic and psychosomatic, at the Medical Department, but at no time outside of the acute episode of March 14, 1962 did he demonstrate any evidence of cardiovascular disease." Treatment of the same nature as in the past was given promptly and the doctor's notes show Walck was kept under observation. The plain inference is that as soon as the pain began to radiate to the left hand, the doctor's impression was that an acute coronary thrombosis had developed. Thereupon, he

acted promptly to call the specialist who advised the hospitalization.

Dr. Lieb testified that if Walck knew he had coronary disease and if on the morning of March 14, acting on the advice of a physician who had previously diagnosed the disease, he had been carrying nitroglycerin pills, and if he had taken a pill and rested at his desk and "had someone come to him and not walked over to the Medical Department [a distance not specified] and gotten first aid and set up a chain of events, with a hypo and oxygen and so forth and gotten to the hospital sooner, he certainly would have deferred his death, he possibly may have survived, I don't know, I think that is speculative, but I think he would have lasted longer." This view was given by a doctor who was not familiar with the type of occlusion revealed by the autopsy, and who was assuming that a previous diagnosis of coronary disease had been made. But that was not the fact here and, as already indicated, no competent proof was adduced to establish that the failure to make such a diagnosis by either Dr. Wilson or Dr. DuBow constituted a departure from professional standards. Lacking such proof, the matter must be considered in the light of Dr. DuBow's earlier non-negligent diagnosis excluding heart disease and his apparent acceptance of the situation on the morning of March 14 as another example of Walck's hypochondria. And there is no expert medical opinion in the record to the effect that Dr. DuBow did not act with reasonable professional dispatch on receiving the impression that a coronary thrombosis had developed.

Under the circumstances, we are satisfied that, on the total record, no violation of the "humane instincts" doctrine of the *Dudley* case was established at the trial.

## III

For the reasons detailed above, in our view, the evidence was not sufficient to justify an award of compensation The

judgment is reversed and the record is remanded for entry of judgment for the respondent Johns-Manville. No costs.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN.—6.

*For affirmance*—None.