256 N.J. Super. 438 (1991)
607 A.2d 651
WILLIAM GOYDEN, PETITIONER-RESPONDENT,
v.
STATE OF NEW JERSEY, JUDICIARY, SUPERIOR COURT OF NEW JERSEY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 15, 1991.
Decided June 10, 1991.
*440 Before Judges J.H. COLEMAN, ASHBEY and LANDAU.
Michael O'Brien, Deputy Attorney General, argued the cause for appellant (Robert J. Del Tufo, Attorney General, attorney; Mary C. Jacobson, Deputy Attorney General, of counsel; Michael O'Brien, on the brief).
Gary E. Adams argued the cause for respondent (Pellettieri, Rabstein and Altman, attorneys; Gary E. Adams, on the brief).
PER CURIAM.
Respondent employer, the State of New Jersey, appeals from the decision of a Judge of Compensation that petitioner William Goyden is 100% disabled because of a chronic and severe depression attributable to his work as supervisor of records in the office of the Clerk of the Superior Court.[1] We reverse.
The Judge of Compensation found that Goyden began the only employment of his life with the Clerk's office in 1959. He became supervisor of records in 1976, a position he held until *441 his retirement in September 1984, at age 42. His immediate supervisor was Alvin Fortson, Assistant Department Clerk. Robert Wagner, Department Clerk, was next in the chain of command. Wagner reported to Lewis Bambrick, Clerk of the Superior Court, who, until he retired in 1983, exercised general supervision over Goyden's section. Bambrick was succeeded by John Mayson. During that time volume increased, there developed increased backlogs in the filing of court documents, along with a change in procedures whereby documents were to be filed locally, instead of centrally. During the spring of 1984 Goyden announced his intention of retiring in September 1984. Prior to retirement, he filed a workers' compensation claim for disability to his internal organs and nervous system stemming from occupational exposure. Following that retirement, which proceeded as scheduled, he was never again employed. He received psychiatric treatment which was unavailing.
Respondent does not question that petitioner is psychiatrically disabled.[2] It contends that the Compensation Judge's finding that petitioner's employment in 1983-1984 was objectively stressful and precipitated his mental illness was unsupported and did not accord with the principles of Williams v. Western Electric Co., 178 N.J. Super. 571, 429 A.2d 1063 (App.Div. 1981).
In his October 10, 1989 oral decision, the Judge summarized his findings.[3] He found that Goyden was
employed in a highly responsible position as a Supervisor of an entire section within the Clerk's Office. At one time he was responsible for up to 70 persons. His staff was reduced without any reduction in the work load. A new computer system was put in place which was not adequate and an ever increasing backlog *442 of unfiled documents resulted.[4] The petitioner's mentor, Mr. Bambrick, resigned in a manner which was described as being "under fire" and a new program was instituted which the petitioner felt would not work.[5]
I feel that this is sufficient objective evidence of working conditions sufficiently stressful to contribute to the development of a mental disorder.
The Judge stated the issue and the applicable principles of law:
The real issue in this matter is whether or not the psychiatric condition from which the petitioner suffers arises out of and during the course of his employment pursuant to the New Jersey statutes.
....
I am ... satisfied that the petitioner meets the requirements set forth in the case of [Williams v.] Western Electric Company, 178 N.J. Super. 571 [429 A.2d 1063] (Appellate Division 1981). The Court in Williams although it reversed a finding of compensability in the case before it, made it abundantly clear that emotional injuries caused by gradual job-related mental stress can be compensable under the appropriate circumstances. The Court stated that in order for such an injury to be compensable .. . the claimant must prove the existence of objective evidence of job stress which when viewed "realistically" establishes working conditions sufficiently stressful to contribute to the development of a mental disorder. It further emphasized that although objective evidence is required, the employee's subjective reaction is not to be disregarded.
We begin any workers' compensation analysis with the applicable statutes; N.J.S.A. 34:15-30 et seq. Goyden claimed that he was entitled to compensation for a permanent mental disability from a compensable occupational disease "arising out of and in the course of employment."
"Disability permanent in quality and total in character" means a ... neuropsychiatric total permanent impairment caused by a ... compensable occupational *443 disease, where no fundamental or marked improvement in such condition can be reasonably expected.
N.J.S.A. 34:15-36.
"Compensable occupational disease" defined
a. For purpose of this article, the phrase "compensable occupational disease" shall include all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment.
N.J.S.A. 34:15-31.
This definition of "compensable occupational disease" was part of the 1979 legislative amendments which narrowed eligibility for workers' compensation. Previously, compensation was permitted for all occupational disease arising out of and in the course of employment, not just that "peculiar" to the employment. The purpose of these 1979 amendments was to "benefit employers" and to limit "compensation for occupational disease to those which are characteristic of and peculiar to a particular employment." See Williams, supra, 178 N.J. Super. at 575 n. 2, 429 A.2d 1063. Williams applied the prior law. Ibid.
Our statutory analysis finds support in Dean Larson's treatise. The disability award sought here represents the broadest reach of compensability, a disease not manifested by physical symptoms nor caused by an accident. 1B Larson, The Law of Workmen's Compensation, § 42.23(b) (1987 ed.). Dean Larson characterizes this combination of work-related cause and nature of injury and disease as "mental-mental." Within that broad compensability, the broadest compensable "mental" cause is a gradual work-related mental stimulus rather than one traumatic incident. Ibid.
In Williams, Judge McElroy pointed out that prior compensation awards for mental disability in New Jersey were limited to those caused by traumatic incidents rather than by gradual mental stimuli. Williams, supra, 178 N.J. Super. at 578, 429 A.2d 1063. This relationship between work-related cause and injury is characterized as "physical" cause and "mental" injury *444 or disease ("physical-mental"). See Saunderlin v. E.I. DuPont Co., 102 N.J. 402, 412-413 n. 7, 508 A.2d 1095 (1986). It is fundamental that our law makes no such distinction. Ibid. The Supreme Court has, however, referred to the need for objective evidence to support expert opinion concerning a psychiatric disability. Saunderlin v. E.I. DuPont Co., supra.
The Williams opinion reviewed and rejected the law of states permitting compensability where the evidence of work-related cause was based primarily on the worker's "subjective" view concerning what working conditions were sufficiently stressful. Williams, 178 N.J. Super. at 581, 429 A.2d 1063.[6] Judge McElroy observed that, were we to award compensability to a worker who suffered a mental collapse because he fell behind in his work if he followed a supervisor's instructions (Carter v. General Motors Corp., 361 Mich. 577, 106 N.W.2d 105 (1960)), or, because the worker was a compulsive perfectionist (Mackenzie v. General Motors Corp., 394 Mich. 466, 232 N.W.2d 146 (Sup.Ct. 1975))[7], we would "change our workers' compensation statute into a program of general health insurance  clearly not the intent of our Legislature." Id., 361 Mich. at 582, 106 N.W.2d 105.[8]
*445 When analyzing criteria for mental disability compensation, Williams also relied heavily on Walck v. Johns-Manville Products Corp., 56 N.J. 533, 267 A.2d 508 (1970), which involved a decedent who allegedly died of a heart attack caused by non-physical work stress during his last year of employment. Id. at 537, 267 A.2d 508. The Walck Court held that "if the nature of an employee is such that he is a worrier, the mere fact that he becomes unnecessarily tense and nervous as to whether he is going to keep or lose his job, without more, would not make a heart attack compensable, even if the heart attack did result from that worry." Id. at 557, 267 A.2d 508.
Finally, it is noteworthy that, in reversing the compensation judge's award in Williams, despite that judge's credibility findings, Judge McElroy found fault with the "credibility of the [petitioner's] entire case." In so doing he relied on discrepancies between the worker's complaints in his petition, the complaints to which he testified, and the complaints which he made to the testifying experts, and which formed the basis of their opinions. Id., 178 N.J. Super. at 574 n. 1, 588, 429 A.2d 1063. As in that case, the issue here is not whether a workers' compensation claimant malingered, but whether the stress, admittedly subjective, stemmed from objectively proven stressful work conditions, rather than conditions which only the petitioner found stressful (or, perhaps, conditions which were not shown objectively to exist at all).
Under Williams, therefore, for a worker's mental condition to be compensable, the working conditions must be stressful, viewed objectively, and the believable evidence must support a finding that the worker reacted to them as stressful. In addition, for a present-day claimant to succeed, the objectively stressful working conditions must be "peculiar" to the particular work place, and there must be objective evidence supporting *446 a medical opinion of the resulting psychiatric disability, in addition to "the bare statement of the patient." Saunderlin, 102 N.J. at 412, 508 A.2d 1095. See Perez v. Pantasote, Inc., 95 N.J. 105, 116, 469 A.2d 22 (1984).
Before examining the medical testimony which not only supported a finding of permanent disability but was relied on by the Judge of Compensation to connect that disability to the working conditions, we first look to those conditions as characterized by the Judge. A compensation judge's decision must be upheld if there is sufficient credible evidence in the record as a whole to sustain his findings, after giving due weight to his expertise in the field and his opportunity to hear and observe the witnesses. DeAngelo v. Alsan Masons, Inc., 122 N.J. Super. 88, 90-91, 299 A.2d 90 (App.Div.), aff'd o.b., 62 N.J. 581, 303 A.2d 883 (1973); Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965). However, a compensation judge's findings must be supported by articulated reasons grounded in the evidence. Lewicki v. New Jersey Art Foundry, 88 N.J. 75, 88-90, 438 A.2d 544 (1981).
In this analysis, we work backwards from the date of Goyden's retirement, September-October 1984. Goyden conceded that, by summer 1984, any disciplinary action concerning his work would have been justified because he was unable to concentrate, being preoccupied with his grievance. He said that his work, which he previously considered to be without fault, was then unsatisfactory, although no adverse action was taken. Mayson described Goyden as becoming more agitated. He said Goyden took time off and did not seem as interested in his work. Mayson said, however, that he told Goyden that he should take any time he needed for his health (a remark Goyden found threatening).
Neither Mayson nor Goyden identified any late 1984 criticism of Goyden's work. Goyden characterized a late July or August 1984 audit of the backlog as based on Mayson's not believing his figures. Fortson, however, testified that there were audits *447 of all departments, and Mayson testified that the audit was done because of his request for overtime funds and additional staff which included Goyden's requests. Mayson said that the purpose of the audit was not to check on the validity of Goyden's document count, but to see how many pleadings could be filed over a specified period of time. While Goyden said he began to feel that the Administrative Office of the Courts (AOC) was not satisfied with his retiring in September, but was going to take steps to remove him, and he feared he would lose his pension benefits, he pointed to no objective working condition to justify that fear. Goyden also said the audit revealed that his backlog predictions were justified. We thus find that, even if Goyden subjectively viewed the events after April 1984 as stressful, there was no evidence to support a conclusion that they were "objectively stressful." We also conclude that nothing concerning Goyden's May 1984 grievance settlement was objectively stressful. It was settled exactly as Goyden wished.
We next focus on the events of March and April 1984, and Goyden's relationship with management. We have detailed in an appendix the subjective view Goyden expressed of Mayson, whom he accused of "vindictive management" procedures. Mayson, whom the judge found to have been credible, testified that he interviewed Goyden as he did each of the 14 supervisors when Mayson was first appointed. At that time Mayson told them that improving personnel capacity was his first priority, and his second was to implement direct filing. His third priority was to continue processing the pleadings. Mayson said that it was because of his impression concerning morale in the office that he had personally reviewed all supervisor evaluations.
In Mayson's preliminary interviews, staff people complained that supervisors, including Goyden, exhibited favoritism. Mayson said he talked to Goyden about this during initial meetings. He also talked about the local filing plan which Goyden opposed, but participated fully in implementing.
*448 Mayson admitted that there was an unprecedented backlog in 1984. He said that he and Goyden worked together concerning the backlog and he increased Goyden's staff as requested by adding temporary staff above the number allocated to him. Mayson said he assured Goyden that "whatever it took we would address the backlog problem." Goyden's responsibility, he said, was to recommend approaches to reduce backlog, not to process it, and Goyden's daily activity did not change as the backlog increased. Mayson said that there were complaints in the office from attorneys about backlogs, but these complaints were a problem for everyone. Mayson found that Goyden performed as a responsible supervisor. When Goyden advised Mayson at a meeting on March 2, 1984, that he would be retiring on his 25th anniversary in September 1984,[9] Mayson said he told him he "would be a benefit to the office, and I suggested that he reconsider...."
On March 19, 1984, Goyden received a management evaluation which formed a significant part of the judge's findings. The judge's opinion, however, did not recite its provisions. Specifically, this evaluation said:
Mr. Goyden has a sound knowledge of duties and responsibilities assigned to him. He completes assignments timely and thoroughly. He makes innovative suggestions. Mr. Goyden possesses good ability to communicate in writing and verbally. Mr. Goyden's interpersonal skills with employees should be improved. He also at times fails to recognize authority.
That review bore Fortson's signature, dated March 1, 1984, and Mayson's, dated March 17, 1984. While a cover memorandum was signed by Mayson and dated March 1, 1984, Mayson said that he signed the form prepared by Fortson.
The day Goyden received the evaluation, he wrote Mayson, taking exception to the last two sentences, and saying he considered the evaluation "vindictive." Goyden's March 19, *449 1984 memorandum was copied to Fortson and to the Personnel Department. On March 22, 1984, Goyden wrote Mayson, asking to be relieved of his liaison duties concerning local filing, saying that he had accepted the position expecting a "substantial advancement in position" in the near future, although what he actually received was what he considered to be an unsatisfactory performance evaluation.
Goyden filed a grievance with Mayson on April 3, 1984. He there described the evaluation as including "defamatory" material "as a result of bias." On April 9, 1984, Goyden sent to Personnel a "more definite" four-page-single-spaced statement to be attached to his grievance "if absolutely necessary." This statement was copied to Mayson. There he said that Mayson had acted illegally against him, "and in a conspiratory manner." He said that it was through Mayson's actions that he could not function properly. He also referred to his hypertension and being forced to retire entirely because of Mayson's actions. On April 10 he met with Mayson, and he ascribed as "stressful" Mayson's statement to him that the grievance did not bother him, so long as Goyden did his job.[10] On April 11, 1984, Goyden sought medical help. He was taken to the hospital where he was tested for heart problems.
Goyden's April 17, 1984 accident report concerning this episode gave as a work-related cause of his then physical symptoms, and Goyden identified it at the hearing as "number one," "vindictive management procedures." At the hearing, he added, almost as an after thought, "[a]lso the fact that the uncontrollable backlog, complete failure to get need[ed] supplies [what supplies were needed was never testified to] and the fact *450 that derogatory statements were introduced into my record."[11]
We have detailed this sequence of events, which to some extent duplicates our appendix. We do so because we find the psychiatric testimony upon which the Judge relied, as well as the Judge's findings concerning it, materially at odds with this record, which is part of the "credibility" of the entire case. See Williams, supra, 178 N.J. Super. at 574 n. 1, 588, 429 A.2d 1063.
In his testimony, it was the March 1984 evaluation which Goyden identified as triggering his depression, and which convinced him of Mayson's personal "vindictive management practice." However, Goyden, Fortson and Mayson all testified that it was Fortson who was, and always had been, responsible for preparation of Goyden's evaluations. Fortson, found credible by the Judge, testified that Goyden had trouble with authority because he would bypass Fortson. Fortson testified that he had discussed this with Goyden who had previously acknowledged his error. Goyden's staff had also come to Fortson complaining. "Subordinates or supervisors like myself sometimes would just, you know, have difficulty communicating with him," Fortson said.
That Goyden had bypassed Fortson, and that there were complaints from subordinates is not disputed in the record. The State argues that an employee's disability claim cannot be triggered by legitimate criticism in an evaluation. We agree. Compensability based on stress from merited criticism is not favored. See State Accident Ins. Fund Corp. v. Anderson, 94 Or. App. 11, 13-14, 764 P.2d 924, 925 (1988) (merited discipline of policeman objectively stressful "with hesitancy" accepted as *451 basis for compensation). This ruling of the Oregon Supreme Court was based on prior interpretation of statute.[12]
There is no similar statutory interpretation problem as to the New Jersey statute. Merited criticism cannot fairly be considered to be a "cause ... and condition ... characteristic of or peculiar to a particular trade, occupation, process or place of employment." N.J.S.A. 34:15-31. Merited criticism is common to all occupations and places of employment.
Having eliminated, as potential work-related causes of disability, the evaluation and those events which took place after the evaluation, we focus next on the allegation that the backlog, staffing, computer problems and local filing were objectively stressful and actually stressed Goyden. The Judge observed that Goyden expressed no objection to local filing, nor any sense of depression as a result, yet that project was identified as a relevant stressful working condition. Similarly, while the backlog of document filing in 1983 was large compared to prior years, Goyden testified that he experienced no significant problems in dealing with it or with the pressure the increased backlog created.
Both medical experts testified that petitioner's depression was caused by his employment. There was, moreover, a record of other doctors making the same diagnosis, although without specifying what conditions of employment were stressful. Goyden's expert psychiatrist, Dr. Orlosky, characterized Goyden as suffering from a major depressive disorder, dependent personality *452 and obesity which had become progressively worse.[13] Orlosky was presented with a hypothetical which formed the backdrop for his professional opinion. We highlight here those aspects which lacked support in even Goyden's testimony.[14] Orlosky was to assume:
The clerk's office backlog was Goyden's "personal responsibility."
Bambrick retired because he was under pressure to lay off employees.
As of March 1984, prior to the evaluation, the work situation made him jittery and nervous.
Goyden responded to reports of Mayson's dissatisfaction by asking for a meeting to "find out exactly what was going on."
After he received the evaluation which was contrary to all prior ones, he was "particularly disturbed by the fact that he had discussed his performance with Mr. Mayson shortly before the issuance of this report...."
After Goyden filed his compensation claim for "vindictive management practices" etc., he frequently left the job early and began to take one or more days off virtually every week.[15]
The following assumptions found support in Goyden's testimony only.
When Goyden asked to be relieved of some duties, Mayson admitted that he had directed that negative comments be inserted, and said, "it could have been worse."
Mayson "seemed to question the seriousness of the situation and demanded more statistical reports from Mr. Goyden."
In July 1984, Mayson told Goyden he did not accept his estimates on the extent of the backlog, and he called for an audit by the Administrative Office of the Courts.
Orlosky found that a combination of the backlog and the criticism Goyden received contributed to his depression, but noted that neither his notes nor other medical reports showed Goyden complained of the backlog. Orlosky particularly identified *453 the evaluation as a triggering event, in that "his symptoms developed soon thereafter," although everything contributed. Orlosky also testified that depression could be caused by "any major loss, such as losing a job or retirement." He identified Goyden's impulsive decision to retire as such a potential cause. Orlosky also testified that if a person wrongly believed that persons were "out to get him" as the only explanation for events, that would be a paranoid idea. Orlosky acknowledged that if objectively determined facts concerning the work-place differed from Goyden's view of them, his impression might change.
Dr. Liccardo, the treating physician for the State, treated Goyden on 23 occasions commencing September 15th, 1986, ending in June 1987.[16] Liccardo described Goyden as a perfectionist, based on an unhappy childhood. Goyden made his employer a substitute father. His identity was tied up in his job, which helped to improve his self-esteem.
Liccardo testified that Goyden's reason for his decision to retire was that "he had a panic attack ... he felt that something happened ... because of that he just could not remember things like he used to." Liccardo thought that Goyden felt he was forced out of his job because of his illness and "chose retirement so that he would not be fired because of the continued deterioration of his performance." Liccardo admitted that these conclusions were based on his impression that Goyden's decision to retire came after his panic attack. He admitted that he did not know when Goyden decided to retire, since his duty was to treat the patient, not to verify facts. He also had seen the March 19, 1984 evaluation for the first time on the day he testified.
When asked if his opinion would change if he learned that Goyden decided to retire before any of these other events, *454 Liccardo testified that his opinion would not change because, "what [Goyden] is responding to are the things that [Goyden] perceived that are going on at work."
Asked Goyden's history, Liccardo traced Goyden's reaction to the increase in work volume to his "perfectionist" personality, but noted that Goyden did not tell him when problems developed in terms of "the workload going up or the employees going down." However, Liccardo responded affirmatively when asked if Goyden indicated that "the work staff reduction came when the new supervisor came in." In response to a leading question, "And did he indicate that's when he started feeling this stress?" Liccardo said, "Yes, that the stress certainly increased extremely at that time and then he felt that the new Clerk took a disliking to him for some reason, and I'm quoting him. He felt I was too loud and too accurate." There followed a description of Goyden's perception of his conflict with Mayson.
Elsewhere, Liccardo testified that each of the 23 visits "was almost a duplicate of the prior visit." Goyden would talk about his symptoms, inability to do things, and end by telling Liccardo the details concerning the majority of his time being "obsessed with what happened at work." Asked if Goyden mentioned any persons when discussing his obsession, Liccardo said Goyden spoke in particular about the "director" (Mayson). He also mentioned the Chief Justice and the woman who took Goyden's place. Liccardo said that Goyden was obsessed about the "fact of what he deemed unfair treatment by his immediate supervisors."
Respecting whether Goyden's description of "unfair treatment" was verifiable, Liccardo said that over the years he had treated a lot of State employees who told similar stories, beginning in the late '60s, and he had concluded that "if things are political... these things actually do happen". In Goyden's case, he believed that there "may have been things going on that were directed towards him." Liccardo rejected a suggestion *455 that Goyden was delusional unless it could be shown that none of the events he described happened: no change in director, no decrease in staff, no conflict over rating employees. In any event, even if his depression was based on delusion, Liccardo said Goyden was depressed, and that as to the cause, "I assume there may be a combination of some things that are strictly psychological and a greater volume that are based in fact."
Liccardo rejected characterizing Goyden as schizophrenic or paranoid, finding him to be a "compulsive personality," "obsessive," and, as he had earlier testified, a "perfectionist," who was always overweight, but who got approval from the job.[17] Liccardo said that all of Goyden's symptoms were based on the "loss of self esteem [which] was extreme when he lost his job ... [a]s he said so many times, his work was his life and his life is over." His opinion that Goyden's depression was related to his employment was based upon his clinical observations, the history given and upon "what Mr. Goyden perceived happened to him at work and his reaction to it."
The Judge said, and we agree, that the State's treating doctor was Goyden's best witness, and the State proffered no other.[18] A medical opinion relating a disability to the workplace must, however, be based on facts submitted in evidence. Black v. Mahoney Troast Const. Co., 65 N.J. Super. 397, 405, 168 A.2d 62 (App.Div.), certif. denied, 34 N.J. 471, 169 A.2d 745 (1961). If a physician's opinion is based on a fact not in evidence, its persuasiveness is greatly undermined. Ibid. A compensation judge is not bound by the unsupported conclusions of experts. Lightner v. Cohn, 76 N.J. Super. 461, 465, 184 A.2d 878 (App.Div.), certif. denied, 38 N.J. 611, 186 A.2d 308 (1962). The judge is obligated to evaluate a doctor's testimony according to his demeanor and qualifications, the *456 trustworthiness of the testimony, and the quality of the underlying examination upon which the opinions are based. Margaritondo v. Stauffer Chem. Co., 217 N.J. Super. 560, 563-564, 526 A.2d 708 (App.Div. 1985), cause remanded 104 N.J. 388, 517 A.2d 394 on remand 217 N.J. Super. 565, 526 A.2d 711 (App.Div. 1986). The value of an expert's testimony also depends upon the accuracy of the hypothetical questions upon which opinions were based. Williams, 178 N.J. Super. at 586, 429 A.2d 1063.
The total record, including the expert testimony, evidences that what Goyden reacted to as stressful on the job was not the objectively verifiable work conditions of backlog, local filing, staff shortages or computers, but his perception of his conflict with Mayson, and, to the extent that Mayson represented it, management.[19]
While Liccardo said that Goyden's perception of his conflict with Mayson might be accurate, based upon Liccardo's experience with other claimants, that is surely not sufficient to establish objectively that Goyden was the "unfair" or "vindictive" target of management. In light of Goyden's support for the local filing, of which he supposedly disapproved, there was no evidence of any objective reason for Goyden to be targeted by management, and ample evidence that he was not. That the Judge found Goyden credible was also not related to supporting any finding that management was vindictive (nor could it be, since the Judge found Mayson and Fortson credible). In finding credible Goyden's testimony, the Judge could only have referred to the credibility of Goyden's description of his perception. Goyden's perception, however, was not determinative.
The judge found,

*457 Mr. Goyden's physical and emotional health was good, and there is no prior history of any emotional problems of any sort other than testimony by the State's treating psychiatrist, John J. Liccardo, M.D., who stated that the petitioner had an obsessive, compulsive personality all his life which was caused by the events of his childhood.
The Judge distinguished those facts of Williams which led to Williams' disability not being compensable, particularly that Williams had suffered from a pre-existing schizophrenia, and there was no expert testimony that Goyden had such a pre-existing disease. Williams, 178 N.J. Super. at 585, 429 A.2d 1063. However, Judge McElroy also related the schizophrenia to the subjectiveness of petitioner's perception of conditions of work which he found stressful. Williams, 178 N.J. Super. at 581, 429 A.2d 1063.
Williams noted that MacKenzie v. General Motors Corp., supra, 232 N.W.2d at 149, did not represent the law of New Jersey. In MacKenzie, the employee had been working at General Motors from 1924 to 1965 when he took early retirement. During his last two or three years, he found that other employees were installing defective parts, requiring him to account. This, in addition to poor work habits of a co-worker, made him work harder and added to his anxiety. His psychiatrist testified that he had a "personality defect of compulsive perfectionism that centered on his job, and that eventually the job pressures disabled him. This was subjective analysis based on MacKenzie's view of his job." The Compensation Board denied compensation, saying there was no law to permit compensation based on petitioner's perception of the work environment. Id. at 151. The Supreme Court of Michigan remanded the matter, noting that a rejection of compensability could properly be based upon a finding that the injury was totally unrelated to employment but could not be based upon rejection of petitioner's subjective view of the workplace. Id. at 152. Two justices dissented, urging that the consumer of a product was never meant to bear the cost of such a disability. Id. at *458 153. We find these facts almost indistinguishable from the facts in this case.[20]
The Judge relied on the fact that Goyden had worked in the same position for 25 years without incident,[21] while the employee in Williams worked only 12 days and the employee in Walck had experienced years of anxiety and tension which were totally unrelated to his work. We need not compare the proofs which satisfied the courts in other cases that there was no liability for workers' compensation. The question is whether objectively verified stressful work conditions found in this case were established which were "peculiar" to the work place and which justified the medical opinion that they were the "material" causes of Goyden's disability. Williams, supra, 178 N.J. Super. at 585, 429 A.2d 1063, citing Walck, supra. We are satisfied that they did not.
Our careful study of the record persuades us that the underlying condition from which Goyden suffered, his compulsive personality, which stemmed from his childhood and tied his self-esteem to his job, created his stress on the job. Liccardo's testimony, accepted by the judge, also supported a finding that Goyden's retirement decision, combined with his personality, triggered his depression, and would have done so, regardless of *459 "peculiar" workplace conditions. The existence of such a predisposition precludes compensability not otherwise supported by evidence of "peculiar" conditions which would be stressful to those without such a predisposition. Williams, supra, 178 N.J. Super. at 582, 429 A.2d 1063, citing MacKenzie v. General Motors Corp., supra, 232 N.W.2d at 149. The findings of the Judge concerning the "peculiar" triggering workplace conditions, based upon the opinions of the experts and the subjective view of Goyden, neglected the "credibility of the entire case." Williams, supra, 178 N.J. Super. at 588, 429 A.2d 1063.
Even though the State concedes Goyden is completely disabled, which is unfortunate for anyone,
[w]e cannot grant what amounts to a lifetime pension at the expense of industry or the ultimate consumer. In such case the societal duty to aid must, because the mental illness did not arise out of employment, be met by some other quarter of society. Here that need is met. Petitioner is presently on total disability, Social Security benefits. Williams, supra, 178 N.J. Super. at 585, 429 A.2d 1063.
Reversed.

APPENDIX
We have here annotated the Judge's findings with reference to Goyden's testimony concerning the work-place conditions. The Judge found:
The petitioner's duties under both Bambrick and Mayson were basically the same. The petitioner managed to function fairly well in this situation for approximately one year. The Court system began "local filing" in 1982 which meant that all manual work went to the local counties. The Clerk's Office in the future was to be done by computer. Between the time that the "local filing" system was implemented and Mr. Bambrick's retirement in November of 1983, the petitioner had been given an additional three and one-half clerks to deal with the problem of this increasing backlog. While the petitioner had a full staff, he was able to "cope" with his position. When his staff was cut, he began having emotional problems feeling that he was unable to perform his duties.[22] As well in addition to the increasing backlog, Mr. Bambrick retired. *460 The petitioner had considered him as his mentor and stated he was devastated by this development and only increased his level of concern regarding his ability to solve the backlog problem and perform his job properly.
It is true that during the years Mr. Bambrick was the Clerk he had an open door policy and the petitioner was able to see the Clerk at any time he had a problem. He felt that this open door policy ceased when Mr. Mayson was appointed the Clerk. Petitioner testified that when Mr. Mayson arrived he met with Mr. Goyden and as the first order of business advised Mr. Goyden that his top priority was to institute the local filing procedure.[23] Mr. Goyden felt that the institution of this program would mean the virtual elimination of the department although he felt that he would still have an active role in the central office.[24] During this period of time the petitioner also acted as a county liaison and had other local filing assignments.
By January 1984, the backlog of documents had grown so great that Mr. Goyden filed a formal report to Mr. Mayson setting forth the seriousness of the problem.[25] By March of 1984, the backlog exceeded 20,000 documents which was larger than any prior backlog in this department. Mr. Goyden felt as far as his emotional state was concerned that his superiors were not attempting to address the situation. He began to feel that the situation was hopeless. He attempted to continue to work to reduce the backlog coming in on Saturdays to *461 try to catch up.[26] He described his emotional state at this time as "very concerned and jittery."[27] He had some problems with the staff during this period of time and was receiving increasing complaints from attorneys because of delays encountered by them in the filing of their documents.
For the entire office of the Clerk there were only 10 computers, and while they were staffed on a round-the-clock basis, other departments other than the petitioner's had to use same and he felt this was another reason for the increase in the backlog.[28] In March of '84 with the backlog exceeding 20,000 documents, the petitioner felt that he was doing a good job. He stated he was told by Robert Wagner that Mr. Mayson was unhappy with his job performance and was "enraged" about a performance rating that the petitioner had given one of his workers.[29] This added to the petitioner's anxiety and he met with Mr. Mayson on March 2nd, 1984. At this time Mr. Mayson denied making any negative comments about the petitioner.[30] According to the petitioner because of reports he had received he felt that Mr. Mayson was being less than honest with him which served to heighten Mr. Goyden's anxiety. At that time he asked about his own rating or evaluation and was told that it was not done yet even though Mr. Wagner had told him that it was done.[31]

*462 In the latter part of March of 1984, Mr. Goyden received his performance rating. In the five years prior to 1984, Mr. Goyden had received a rating of outstanding. This rating (1984) was satisfactory and contained negative comments regarding his skills as a Supervisor. He was, however, recommended for a raise in pay. The petitioner stated he was thunderstruck by this evaluation.[32] He stated that he had always taken a great deal of pride in his work, and felt he was doing his job well under very difficult circumstances. He felt that his professional abilities were slandered by this review and believed his career in the Court system not only for the State of New Jersey, but elsewhere were being jeopardized by the negative comments in his evaluation.[33] According to Mr. Goyden, this added more anxiety to that which he was already suffering. The increasing backlog of documents in Mr. Goyden's department now exceeded 30,000.
As a result of his rating in 1984, Mr. Goyden filed a grievance under the Civil Service system.[34] While this grievance was pending, Mr. Goyden on April 10th, 1984, was called in to a meeting with Mr. Mayson and Mr. Wagner, the Deputy Clerk.[35] According to the petitioner, Mr. Mayson cast doubts on Mr. Goyden's *463 ability to continue as a Supervisor.[36] He stated he was stunned by this comment having never been criticized before for his supervisory abilities. This meeting in conjunction with what had transpired earlier convinced Mr. Goyden that his job was in jeopardy. That night he was unable to sleep stating he felt like a nervous wreck. He went to work the next day. Shortly after arriving, he developed a burning sensation in his chest, pain in his face, head and shoulders and began to hyperventilate. He reported to the nurse on the premises who advised him to seek medical attention. Later that day he went to his HMO physician and described himself as being extremely distraught; felt his job situation hopeless and that his future in his field was "dashed."
He did go to the hospital where an EKG was taken and reported as normal. He remained out of work for several days. During this period his physician had recognized that his physical complaints were secondary to his emotional condition and he began taking medication for anxiety. He discussed this with Mr. Mayson and was told to take some time off. He personally took this as a threat to his job. The petitioner stated that he recognized that his working conditions being the understaffing; the backlog; the satisfactory rating with comments and what he considered his inability to get help from his superiors had made him a nervous wreck. He filed an accident report so stating.[37]
Although the petitioner continued to work, his emotional problems continued. He found himself exhausted all the time; unable to sleep; severe headaches; forgetful and nervous. At this time he stated he came under the care of Dr. Jack Ward, a psychiatrist, who reported, according to the petitioner, that he was suffering from agitated depression secondary to job pressure.
In May of 1984, the grievance hearing took place. There was a settlement by mutual consent of the parties. Based upon the recommendation of the attorneys, the settlement consisted of removing all comments from the petitioner's 1984 annual review both good and bad and just calling the rating satisfactory. The petitioner felt that this was an additional harassment because it had not *464 been done sooner.[38] Petitioner agreed that his duties did not change even though the backlog was increasing and further stated that during his last months on the job his emotional problems got worse, and he felt he was doing a poor job even though no one ever took steps to reprimand him.
By June of 1984, the backlog of unfiled documents in his department exceeded 60,000 which by all accounts was a record high. By this time the petitioner felt that his only means of escaping the entire situation was to apply for his retirement which took place as of October 1st, 1984.[39] Mr. Goyden felt that by retiring he could improve his mental health and move on with the rest of his life.[40]
Petitioner said that after he retired he dwelled on his problems; felt his life was over; that he had lost 25 years with the Court; that all his friends were in Court. He felt cut off from his friends; lost his entire social life; began to despair even more and additionally began to gain a lot of weight. He was seeing his own doctor monthly for medication, and even though he began to feel some improvement, he ultimately asked for medical treatment from the State and was sent by his employer, the State, to Dr. John Liccardo.
LANDAU, J.A.D., dissenting.
The judge of compensation demonstrated full awareness of the rationale in Walck[1] and Williams,[2] and concluded that *465 there was "sufficient objective evidence of working conditions sufficiently stressful to contribute to the development of a mental disorder." He took note of a reduction in the staff which Goyden supervised without reduction in the work load; the inadequacy of a new computer system; an ever-increasing backlog of unfiled documents; the resignation of his mentor, perceived as being "under fire;" and institution of a new program which, although Goyden believed would not solve the problems, he worked to implement.
Several psychiatric witnesses, including the State's own expert, who treated Goyden, concluded that his psychiatric disability was materially caused or contributed to by the stress of those factors. At least some of those factors were indisputably objective, and they are supported by the record. A more stable, less compulsive psyche might not have fractured under the increasing pressures of workload and working atmosphere. But Goyden was a compulsive perfectionist, who perceived himself as being unable to achieve standards which he could accept.
The compensation judge found that the factors which generated disabling stress to a person of Goyden's psychological make-up were objectively present. Thus, I would affirm, under Close v. Kordulak Bros., 44 N.J. 589, 210 A.2d 753 (1965).
NOTES
[1] Goyden received a permanent disability award of $114,750, the computation of which is not challenged.
[2] At the time of the hearing Goyden was receiving a State pension of $625 a month; social security disability income of $880 and $200 each for two children a month.
[3] In an appendix to this opinion, we have reprinted substantial portions of the text of the judge's findings, and annotated them with references to Goyden's testimony.
[4] Under the post-computer entry system, Goyden was responsible only for verifying the Law Division pleadings. Others then docketed the pleadings on the computer. Delay in verification backlogged delay in computer entry. Goyden observed that data entry had a greater backlog problem. One calculated the backlog as the difference between pleadings received and pleadings processed over any period of time, and it was Goyden's department which reported on those statistics.
[5] Goyden testified that Bambrick had a conflict with the Administrative Director of the Courts. When Bambrick announced his retirement, he said to the staff that "a lot of heroes wind up dead heroes."
[6] Based on Dwyer v. Ford Motor Co., 36 N.J. 487, 493, 178 A.2d 161 (1962), Judge McElroy also rejected for New Jersey a common rule of other states requiring the employee to establish that the work-related stress be "out-of-the ordinary." (citing as example Swiss Colony, Inc. v. Dept. of Ind., L. & H. Rel., 72 Wis.2d 46, 240 N.W.2d 128 (Sup.Ct. 1976)). Id., 36 N.J. at 585, 178 A.2d 161. See 1B Larson, supra, The Law of Workmen's Compensation, § 42.23(b).
[7] This case was consolidated and is cited in West's, Northwestern Reporter, as Deziel v. Difco Laboratories, Inc., see infra n. 20.
[8] Dean Larson notes that a research study by the California Workers' Compensation Institute published in April 1988 indicated that mental stress claims, two-thirds of which originated in white-collar jobs, might then approach 17 percent of all lost-time injuries, leading states with less restrictive eligibility criteria, like Oregon, to tighten eligibility requirements by legislation. 1B Larson, The Law of Workmen's Compensation, supra, at § 42.25(a), as supplemented Dec. 1989, at 7-694 n. 6. See also the Michigan statutory change, infra, n. 20.
[9] Mayson testified that petitioner mentioned the subject of retirement to him in his initial interview with Mayson and several times before the March 2, 1984 meeting.
[10] The Judge characterized this as casting doubts on Goyden's ability to supervise. Mayson's reference to Goyden's grievance and his ability to do his job was never related by any witness to the immediately preceding documents indicating the amount of time which Goyden was then directing to (and his already existing preoccupation with) his grievance.
[11] The April 17 report itself also listed "grossly inadequate staffing," and "unethical use of EPEIS performance evaluation and subsequent dialogue designed to intimidate and harass employee."
[12] This case preceded statutory modification. Dean Larson reports that in 1987, the Oregon definition of occupational disease was amended. Mental disorder was made not compensable unless "(a) the employment conditions producing the mental disorder exist in a real and objective sense; (b) [they] are conditions other than ... inherent ... or ... reasonable disciplinary, corrective, or job evaluation actions by the employer, or cessation of employment ... (d) there is clear and convincing evidence that the mental disorder arose out of and in the course of employment." (Emphasis added.) 1B Larson, The Law of Workmen's Compensation, supra at § 42.23(e), as supplemented Dec. 1989, at 7-678.
[13] Goyden testified that, by the summer of 1986, with the help of general medical practitioners, he had lost 100 pounds, and was getting "back on the ball" when the State authorized his treatment with Liccardo, and "all this muck was drudged [sic] up again." He gained 170 pounds, "to the point where I just gave up." At the time of the hearing he weighed about 360 pounds.
[14] See the appendix at the end of this opinion.
[15] We have no reason to doubt this statement, but there was no testimony to that effect.
[16] That the State as employer had authorized this treatment is, of course, not an admission of liability. N.J.S.A. 34:15-15.
[17] Liccardo also testified that depressed persons often ate for solace.
[18] The judge made no credibility finding concerning Orlosky.
[19] We have detailed Goyden's actions which could fairly be characterized as contributing to this conflict, recognizing that no such link was made at trial. We have also noted that, chronologically, Goyden's announced decision to retire preceded open conflict with Mayson.
[20] The Michigan Legislature amended its Workers' Compensation statute following the remand in MacKenzie, see Deziel v. Difco Laboratories, Inc., 403 Mich. 1, 26, 268 N.W.2d 1 (1978). The new statute defined the causation standard for mental disabilities as "arising out of actual events of employment, not unfounded perceptions thereof." M.S.A. § 17.237(301)(2). [M.C.L.A. § 418.301(2)]
[21] There was some evidence of a prior medical history, although not psychiatric. We have noted Goyden's April 9, 1984 reference to hypertension. Goyden also testified that, while with the Appellate Division, in 1975 or 1976, he thought the Clerk had harassed him and his wife for a civil service appeal.

I advised her [the Appellate Division Clerk] ... I had went to the doctor and my blood pressure started shooting up pretty much and I told her that we couldn't do it. If you make us do this, if you keep the pressure on us like this then I'm going to have to hold you responsible for anything that happens to me medically.... At that point the reprisals stopped.
[22] Goyden testified that the 1982 layoff was occasioned because 22 clerks were needed for 22 docket-books, but with documents being sent to the counties for filing, his state-wide computerized work started with no backlog as of October 1982. As a backlog on the computer increased, his staff was increased so that he had 10 people working 10 computers before Bambrick retired and Mayson raised his staff to 17.
[23] It was Goyden's "feeling" that local filing was "more or less, the object of Mr. Mayson's appointment, and that the Administrative Director and the Chief Justice had a plan, `phasing out the [clerk's] office.'" He said the dedication of the AOC to local filing meant that "the central office had to fail" in order to free up the funds needed to implement the local projects. What Mayson told him was that the Chief Justice favored local rather than central filing. Goyden testified that he advised Mayson to expedite the local filing, rather than the other way around.
[24] Goyden testified that prior to the March 1984 review he "was in line for the Assistant Deputy Clerk position or a County Liaison officer position that probably would be created later on...."
[25] Goyden testified that this report followed Mayson's request for a "work status situation in every section" and from every supervisor, including Goyden. Goyden characterized Mayson as "never" responding to his report, except by assigning him the duty to handle pro se litigants which a new law clerk could not handle. That "told" Goyden "they didn't care"; "they wanted this irreversible backlog."
[26] Goyden acknowledged his duty was merely to report the backlog, not to cure it. He had always done overtime at peak periods. That overtime included other workers, and went on as long as the funds were there.
[27] Goyden said that prior to March 1984, "I was a little more jittery.... It didn't really get to me because I was used to this pressure.... The only difference was I saw no hope of coming back [referring to eliminating the backlog], but I still felt that I was doing my job...."
[28] That others besides Goyden's staff were using computers does not appear from Goyden's testimony. Goyden testified that his computers were monitors. It was another section which docketed pleadings. One shift was 10 people, using the 10 computers. There were at least 10 other computers for data entry.
[29] Goyden said that the Clerk's personal assistant told him Mayson was enraged about the evaluation. He said these were "words I unquestionably believed." Although Wagner was Deputy Clerk at the time of the hearing, he was not called as a witness.
[30] Goyden identified this meeting as "crucial," but he did not testify that Mayson commented on or was asked about "negative comments." He testified that Mayson agreed with his evaluation of the subordinate and said he had not "gotten around" to Goyden's evaluation. Goyden concluded Mayson was not honest from the discrepancy between what Mayson told him and what others had said, not from anything Mayson did say.
[31] Goyden testified that at this meeting he told Mayson he would be retiring in September, "and that [Mayson] could mold whatever supervisor to take my place into what he wants, because I didn't know what he wanted. And at that point I left." He told Mayson he intended to seek employment in the federal court system. Goyden sent Mayson a written notice of his retirement intention the next business day.
[32] Both Mayson and Fortson testified to speaking to Goyden earlier about the subject of the two allegedly derogatory comments. Goyden said he had "an inkling ... that his performance was going to be attacked" at the March 2nd interview with Mayson. He also said he knew from Wagner that Mayson had these criticisms.
[33] Goyden said "something else was going on that I wasn't aware of ... I really thought ... that he [Mayson] was going to start introducing papers into my record that would lead to my dismissal."
[34] Because of the "satisfactory" rating, apparently there was no right of appeal. Accordingly, grievance procedures were delayed, amid memoranda between Goyden, Fortson, Mayson and Personnel. Goyden blamed Personnel for not extending a greater exception in his case than it did. He also said that Mayson had overruled Wagner in transmitting the grievance to Personnel instead of handling the matter, and that Personnel's handling showed that "the AOC was just as interested in getting rid of me as was Mr. Mayson."
[35] The day before this meeting, April 9, 1984, as a part of his grievance, Goyden signed a more definite statement. In that statement he said it was because of Mayson, and "considering my hypertensive medical history," he had no alternative but to elect early retirement, and "appropriate legal remedies will be utilized for compensation of these damages." His ensuing treatment by the Mercer Regional Medical Group was certified to be for April 12, 13, 16, 19 and 23, 1984, and his April 17, 1984 report of employment injury said he was out of work from April 11 to April 17.
[36] Goyden first testified that Mayson told him that "the grievance did not disturb him but what did disturb him was my inability to carry out my job as supervisor." Later he testified Mayson said that Goyden's inability to function "would" disturb Mayson, not "did" disturb him. Goyden said, "that to me meant he would be taking steps to remove me and even though I was going to retire as soon as possible in September apparently he wasn't satisfied with that."
[37] Goyden regarded Mayson's request for a doctor's excuse for his time off as further harassment.
[38] Goyden testified that removing the unsatisfactory remarks "is exactly the way I wanted in the first place. I told them I had to spend a thousand dollars to get what I wanted in the first place. They could have held it informally ... [i]t was just pure duress. While the amended evaluation "was a help", ... I knew they were out to get me and every once in a while I'd get a little remark sent to me by Mr. Mayson." Goyden gave as an example that, when at Goyden's request, Mayson removed an unsatisfactory employee from Goyden's department, Mayson remarked, "you still have four more months to go." That meant to Goyden "you'd better watch out...." Goyden also said that Mayson's action in trying to remove him as a supervisor was a "test case."
[39] Goyden testified he was "just living day by day waiting for September to come so I could get out of there." Although Mayson testified that Goyden's letter of resignation came in August, Goyden always spoke of deciding to retire in March 1984.
[40] Goyden testified that the week of his retirement, he "felt kind of relieve that it was all coming to an end and thought sure I would come around and be able to continue my life after that...."
[1] Walck v. Johns-Manville Products Corp., 56 N.J. 533, 267 A.2d 508 (1970).
[2] Williams v. Western Electric Co., 178 N.J. Super. 571, 429 A.2d 1063 (App. Div. 1981).