625 A.2d 567

JEANNE MATHESIUS, PETITIONER–RESPONDENT,
v. SAINT BARNABAS MEDICAL CENTER,
RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 29, 1993—Decided June 2, 1993.

Before Judges PETRELLA, LONG and KEEFE.

*Francis T. Giuliano* argued the cause for appellant.

*Barry L. Frank,* argued the cause for respondent (*Cimiluca and Frank,* attorneys, *Mr. Frank* on the brief).

The opinion of the court was delivered by

KEEFE, J.A.D.

Respondent Saint Barnabas Medical Center (St. Barnabas) appeals from a judgment of one hundred percent disability, awarded in favor of petitioner. In essence, the compensation judge found that a stress induced stroke arose out of and in the course of petitioner's employment. On appeal, St. Barnabas contends that the judge relied upon incompetent evidence to render his decision and misapplied applicable substantive law. We agree and reverse.

Petitioner worked for St. Barnabas for twenty three years, beginning there as a volunteer. She later became a paid unit

coordinator and eventually a unit manager. In 1974, on her own initiative, petitioner approached the vice president of the hospital with her proposal to begin a Patient Relations Department. After receiving permission to do so, she organized and subsequently ran the department until her retirement in 1988.

John Spilek, an Assistant Vice President, became petitioner's supervisor in 1984. Petitioner testified that she believed Spilek did not like her. When asked why she had this perception, petitioner noted that Spilek never came to her office for informal meetings, and never complimented her department. When pressed for specifics regarding these negative statements, petitioner was unable to provide concrete examples.

The specific incidents surrounding this claim have to do with a period of time beginning with the end of January, 1988. Petitioner advised Spilek on January 22, 1988 that she was going to have cataract surgery during the following week, and that she expected to be out for a few days. She inquired, at that time, as to whether Spilek wanted her to take home materials necessary to complete her year end report while she was recuperating. Petitioner testified that she was advised by Spilek that there would be sufficient time to complete the report upon her return to work, and that she should spend the time at home taking care of herself. At trial, Spilek agreed with petitioner's characterization of that meeting, although his recollection of their conversation was more vague than that of petitioner. The year end report in question was one which petitioner had completed for her department for the past fourteen years. It was based on monthly reports, also prepared for the department by petitioner, and was usually anywhere from three to five typewritten pages. Petitioner testified that she loved writing, and loved her department, and that the report was easy to write. She normally did it in two days. Spilek testified that the report, although it went to the Executive Vice President of the hospital, was not a measure of efficiency, or any vehicle which could be used as a source of evaluation of petitioner's performance. It was rather, he noted, an opportunity to

summarize the positive aspects of a department by detailing specific events which had occurred throughout the year. Spilek testified that there would have been absolutely no repercussion if petitioner had handed in a shorter or less detailed report for the year in question than she had in any other year.

Both petitioner and Spilek were in agreement that the due date for the year end report had always been somewhere around the second week of February. The date was actually determined by the Executive Vice President of the hospital, and was acknowledged by inter-departmental memo, which was received by each department far in advance of the actual date.

On Saturday January 30, 1988 at approximately 6:30 p.m., while at home recuperating from her cataract surgery the Tuesday before, petitioner claimed to have received a call from her assistant Burt Gartenlaub. Burt advised petitioner that she would have to complete her year end report in time to "have it on John's [Spilek's] desk on Monday." Petitioner apparently received this news with some incredulity, as she had discussed this very matter only one week prior with Spilek himself. However, petitioner did not attempt to confirm the information with Spilek or his secretary, who had allegedly made the call to Gartenlaub. Neither Gartenlaub or Spilek's secretary testified.

Petitioner testified that after her conversation with Gartenlaub she was "very, very upset." She proceeded directly to the hospital to gather her materials to do the report. She noted that she was at the hospital no longer than one half hour, and was back home by about eight o'clock or eight thirty, as the hospital is only a five minute drive from her home.

Petitioner testified that she had been "too upset" to begin the report that evening, and set her alarm to begin at seven the next morning. She did not sleep well, and was awake before her alarm sounded the next morning. She went directly to work on the report. She did not stop to eat breakfast or lunch, but did eat a half slice of toast, and tried to drink a glass of milk and a vodka

and tonic at some point during the day. Both drinks tasted "funny," so petitioner testified that she threw them out.

Petitioner testified that throughout the day she experienced a pounding heart, a burning feeling and felt "hot" all over. She stated that she knew something was happening, but didn't think it was anything she couldn't "handle." She noted that she could not even think clearly at times, because she was so angry that she had to do the report.

> I love to write and I love the department, so it was easy to write the report, but I couldn't get over the unfairness, it just kept—my head was on fire, I couldn't believe that it could happen and at some point my heart began to pound and I really—I knew I was in trouble but it thought I could handle it.

Petitioner finished the report at approximately eight o'clock that night. She testified that she called Burt to say that the report was complete, and that Burt would have it to type the next morning. She sat down in the chair in front of the television, and apparently dozed, while watching what she said may have been the second half of the Superbowl. She testified that she subsequently watched the ten o'clock news.

The next recollection plaintiff had, was of laying on the floor, in the same clothes as she had worn all day Sunday. When she attempted to get up from the floor, in response to her name being called by a neighbor, petitioner testified that she slid back down again, "like jello." The neighbor called the rescue squad. Petitioner was taken to St. Barnabas Hospital, where she was diagnosed as having had a stroke.

In her action for workers' compensation, petitioner alleged that stress and pressure from work, specifically, her stressful working relationship with John Spilek over a period of time, in combination with the intolerably stressful day she spent in preparing her year end report on one day's notice, contributed to the stroke which occurred on the evening of January 31, and which has rendered her completely disabled.

Four medical doctors testified at trial. Petitioner's two experts testified that petitioner was under considerable stress on January

30 and 31, 1988. The stress substantially contributed to the development of an increased occurrence of paroxysmal atrial fibrillation, which subsequently contributed to the development of a mural thrombus traveling to the brain as an embolus, cutting off circulation there, and resulting in hemiparesis which rendered her totally disabled.

Respondent's experts, opined that the stroke had been a result of a thrombus, caused by pre-existing arteriosclerosis. They discounted the idea proffered by petitioner's experts that the stroke had been the result of paroxysmal atrial fibrillation.

The Compensation Judge found petitioner's experts to be more credible than those of respondent. St. Barnabas does not challenge that finding on appeal.

I.

St. Barnabas argues that evidence of the alleged telephone conversation between petitioner and Burt Gartenlaub regarding the deadline for the year end report was hearsay, and should not have been considered by the judge of compensation in rendering his decision. Although St. Barnabas concedes that under *N.J.S.A.* 34:15–56, the compensation judge "conducting the hearing shall not be bound by the rules of evidence[,]" it argues that *Gunter v. Fischer Scientific American*, 193 *N.J.Super.* 688, 475 *A.*2d 671 (App.Div.1984), holds that the statute was meant to simplify the proofs, but, ultimately, any award granted to a petitioner must be based on competent evidence. St. Barnabas argues that the alleged telephone conversation was not competent evidence to prove the truth of the matter under discussion; that is, whether Gartenlaub had received a call from John Spilek's secretary, indicating that the year end report from petitioner's department had to be on his desk the following Monday morning, February 1, 1988.

We need not decide this issue for two reasons. First, petitioner concedes in her brief that the testimony concerning the telephone call was not offered to prove that Spilek had told his secretary to

advise Burt Gartenlaub that petitioner's report was to be completed by February 1, 1988. Rather, she contends that the testimony was offered to show what prompted petitioner to become so upset and to work all day Sunday without eating or taking a break. Petitioner also acknowledges in her brief that she may have misinterpreted the message conveyed to Gartenlaub. She argues that the "true" message of the call is unimportant. What is important in this regard, she argues, is that the call was interpreted by her as a change in previous arrangements, to which she had to immediately respond.[1] Second, the judge's decision does not indicate that he relied on the hearsay testimony to rule against St. Barnabas.

## II.

In 1979, the New Jersey Legislature enacted comprehensive reforms to the Workers' Compensation Act. Although the purpose of the reform was to permit more substantial awards to seriously injured workers, a number of the provisions were designed to contain compensation costs stemming from certain court decisions. *N.J.S.A.* 34:15-7.2 was enacted as one of those cost containment provisions. It provided that,

[i]n any claim for compensation for injury or death from cardiovascular or cerebral vascular causes, the claimant shall prove by a preponderance of the credible evidence that the injury or death *was produced by the work effort or strain involving a substantial condition, event or happening in excess of the wear and tear of the claimant's daily living* and in reasonable medical probability caused in a material degree the cardiovascular or cerebral vascular injury or death resulting therefrom.

Material degree means an appreciable degree or a degree substantially greater than *de minimis. N.J.S.A.* 34:15-7.2 (Emphasis added).

In *Hellwig v. J.F. Rast & Co., Inc.,* 110 *N.J.* 37, 538 *A.*2d 1243 (1988), the Court described the progression of the interpretation

---

[1] As will be seen in Part II of this opinion, plaintiff's subjective, good faith reaction to the phone call is not material to the issue of compensability. The question with regard to compensability, is whether there was any objective basis to conclude that the employment conditions were stressful.

of *N.J.S.A.* 34:15–7.2 from 1949 through 1962, beginning with the case of *Seiken v. Todd Dry Dock, Inc.*, 2 *N.J.* 469, 67 *A.*2d 131 (1949), overruled on other grounds, 27 *N.J.* 138. In *Seiken*, a shipyard foreman who suffered chest pains while lifting metal was found not to have a compensable injury, because his injury was suffered while he was doing his regular job, and was not caused by any unusual strain or exertion. In 1958, the Court, in *Ciuba v. Irvington Varnish & Insulator Co.*, 27 *N.J.* 127, 141 *A.*2d 761 (1958), overruled the requirement in *Seiken*, that the work effort, in order to be compensable, must be more strenuous than the effort regularly expended to do one's job. In *Ciuba*, the Court found a compensable injury where the petitioner suffered an attack during the installation of an oven drive shaft unit, where the physical exertion had been consistent with the effort regularly expended by petitioner on the job. Finally, in *Dywer v. Ford Motor Company*, 36 *N.J.* 487, 178 *A.*2d 161 (1962), the Court again expanded the field of compensability, finding that a succession of employment strains, not one material incident, contributed in a material way to petitioner's accident, making that accident compensable.

In *Hellwig*, where the Court found the death of a pipe steamfitter from a heart attack on the job to be compensable, the Court acknowledged that "[t]he Legislature plainly expressed its intention to modify the holding in *Dwyer*[.]" *Hellwig, supra,* 110 *N.J.* at 48, 538 *A.*2d 1243. In holding that the work effort contributing to compensable injury did not have to be greater than the ordinary work routine, as long as that effort exceeded the effort expended in the employee's daily activities outside the workplace, the *Hellwig* Court discussed two areas where the changes to *N.J.S.A.* 34:15–7.2 had modified the *Dwyer* decision. First, where the *Dwyer* Court had found that "benefits are not lost because the work effort could be duplicated at home[,]" *N.J.S.A.* 34:15–7.2 notes that to be compensable, the stress must be in excess of that required for the "wear and tear of daily living." *Id.* Additionally, where *Dwyer* indicated that a "material degree" indicated an "appreciable degree; greater than de minimis," *N.J.S.A.* 34:15–7.2

now indicates a material degree is "an appreciable degree or a degree substantially greater than de minimis." *Id.* at 50, 538 *A.*2d 1243. In reviewing the revised criteria, the *Hellwig* court noted,

We view the Legislature's modification of the *Dwyer* criteria as an effort to require more reliable proof of the connection between work effort and cardiac dysfunction. [*Id.* 110 *N.J.* at 54, 538 *A.*2d 1243.]

It is not disputed by St. Barnabas on appeal that petitioner was experiencing stress, or that the stress contributed to petitioner's subsequent medical condition. Rather, the issue is whether the stress experienced by petitioner must be objectively related to her employment, so as to make her injury compensable.

St. Barnabas argues that the cases of *Walck v. Johns–Manville Corp.*, 56 *N.J.* 533, 267 *A.*2d 508 (1970), and *Goyden v. State of New Jersey Judiciary*, 256 *N.J.Super.* 438, 607 *A.*2d 651 (App.Div. 1991), *aff'd per curiam* 128 *N.J.* 54, 607 *A.*2d 622 (1992), bear directly on the case at hand, and were not sufficiently considered by the Compensation Judge. Although *Walck* was decided prior to the revisions to *N.J.S.A.* 34:15-7.2, it deals extensively with the relationship of the stress experienced by the petitioner to the subsequently occurring injury. In *Walck*, the Court reversed an award to a widow for a heart attack suffered on the job by her husband, due to the insufficiency of proof that the heart attack was related to work tension, or to negligent treatment by the company's physician. The Court observed:

[W]orry, which came into being because of the inherent nature of the employee and which is not shown by the greater weight of the evidence to have had a reasonable basis in fact, cannot be said to give compensability to a heart attack which is attributed to emotional strain resulting from such unfounded or imaginary worry. [*Id.* at 557, 267 *A.*2d 508].

To be compensable, the *Walck* Court noted that the heart attack must be due, in a "realistic sense and material degree, to a risk reasonably incident to the employment." *Id.* at 556, 267 *A.*2d 508.

Similarly, in the instant matter, petitioner had an unfounded "impression" that her supervisor did not like her. When asked why she had this impression, petitioner could provide no specifics, and the judge made no findings to support petitioner's belief.

Additionally, petitioner claims she was under intense stress to complete her year end report as ordered by her supervisor. There is no evidence to support a finding that such an order was issued. John Spilek, the supervisor, insists he had not given such an order, and the judge found him to be credible. Petitioner herself admits that the order to complete the report contradicted what she had been told in a face to face meeting with Spilek only a week before, and concedes there may have been some misunderstanding by her assistant of the message conveyed by Spilek's secretary. Petitioner testified that the report, which she had done for fourteen prior years, had never been due before the second week in February, and she had no first hand information that it was due on February 1, 1988. In light of *Walck*, there was no reasonable basis for petitioner's conclusion that her employer created the stressful situation.

In *Goyden, supra*, the claimant supervisor of court records, who alleged his severe depression was due to a highly stressful work situation, was awarded one hundred percent disability by the judge of compensation. This court reversed the award, finding that petitioner had created his own workplace stress because of his compulsive personality, and that the actual condition of the workplace had not materially contributed to his depression. The Supreme Court affirmed substantially for the reasons stated by us. 128 *N.J.* at 54, 607 *A.*2d 622. We had determined that in order for the mental illness to be compensable, the workplace conditions must be objectively stressful, and the claimant must react to them as such. We had further held that what the petitioner had actually found to be stressful, was not any condition peculiar to that workplace, but rather his perception of his conflict with his supervisor and with management.

> The total record, including the expert testimony, evidences what Goyden reacted to as stressful on the job was not the objectively verifiable work conditions of backlog, local filing, staff shortages or computers, but his perception of his conflict with [his supervisor], and, to the extent that [his supervisor] represented it, management. [*Goyden, supra*, 256 *N.J.Super.* at 456, 607 *A.*2d 651.]

Much of the reasoning in *Goyden* is applicable to the matter at hand. Although petitioner's claim concerns a physical injury induced by stress, and not a mental injury induced by stress, we can see no meaningful difference between the two cases in light of *Walck.* This court has previously expressed a similar view in a different factual context.

> There is, thus, an analogy in principle between occupational disease cases generally and the heart and cerebral accident matters in that they all necessarily focus upon the requirement that the claimed condition (or aggravation thereof) arise out of the employment. [*Williams v. Western Electric Co.,* 178 *N.J.Super.* 571, 578, 429 *A.*2d 1063 (App.Div.1981)].

As indicated above, the record compels the conclusion that the stress experienced by petitioner, like that in *Williams* and *Goyden,* was not objectively related to her working conditions.

> [T]he issue here is ... whether the stress, admittedly subjective, stemmed from objectively proven stressful working conditions, rather than conditions which only the petitioner found stressful (or perhaps, conditions which were not shown objectively to exist at all). [*Goyden, supra,* 256 *N.J.Super.* at 445, 607 *A.*2d 651.]

Dr. Friedman, petitioner's own expert, described her as an "obsessive, compulsive type of individual ... [who] often worked sixty hours a week[,] ... [and] often took work home." The trial judge was almost incredulous that a woman whom he described as "quite a go getter before the stroke," who had started the department she ran, and who had over twenty years of experience in the same work environment, would plunge blindly ahead to complete this report, without verification that it needed to be done. When he questioned petitioner why she had not attempted to reach her supervisor, or in fact anyone in authority at the hospital, to verify the urgency of completing the report, petitioner responded that she was "used to taking orders." The judge, however, observed,

> Not from your own assistant. In other words, you had—yourself as a professional had an understanding with an administrator and then on a Saturday night you get an odd phone call from someone who is supposed to be your assistant telling you you got to have a report on someone's desk on Monday morning but you didn't backtrack yourself, in terms of verifying that?

The Judge openly expressed doubt as to the objective basis for petitioner's claimed stress.

Perhaps it was something that she decided to do herself. That will be ultimately for me to decide. There's a serious question here as to whether or not anybody in authority ordered her to do that. There may well have been a mistake here, maybe that's the wrong word to use, but her administrator testified that she had plenty of time to do these reports. She had been doing them for a number of years, knew when they were regularly due and took it upon herself, not to question on Friday (sic) night that a report had to be due on Monday after she had been in this position a number of years, but took the word of a secretary, who apparently is since retired and is gone, that a report had to be done. She went ahead, took the paperwork home, decided not only was she going to do the report, she wasn't going to eat anything and she was going to have somebody over to watch the Superbowl.

A compensation judge's decision must be upheld if there is sufficient credible evidence in the record as a whole to sustain his findings, after giving due weight to his expertise in the field and his opportunity to hear and observe the witness. *DeAngelo v. Alsan Motors, Inc.*, 122 *N.J.Super.* 88, 90, 299 *A.*2d 90 (App.Div.), *aff'd o.b.* 62 *N.J.* 581, 303 *A.*2d 883 (1973); *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965). The findings "must be supported by articulated reasons grounded in the evidence." *Lewicki v. New Jersey Art Foundry*, 88 *N.J.* 75, 88–90, 438 *A.*2d 544 (1981). Here we are not so much in disagreement with the trial judge's fact findings as we are in the legal significance he attached to the facts. Simply stated, it does not matter that plaintiff had a good faith belief, albeit mistaken, that her employer had created a condition of stress. The key to the analysis is whether there was a reasonable and objective basis in the record to conclude that the employment condition was stressful. Without that finding, there is simply no compensable event, regardless of the conclusion that petitioner's stroke was stress induced. The evidence clearly does not establish the necessary factual predicate.

The judgment under review is reversed. Judgment shall be entered in favor of the employer, St. Barnabas Medical Center.